JAMES S. THOMSON, ESQ. - SBN 79658
Law Offices of JAMES S. THOMSON
819 Delaware Street
Berkeley, CA 94710
(510) 525-9123
james@ycbtal.net

JOHN T. PHILIPSBORN, ESQ. - SBN 83944
Law Offices of JOHN T. PHILIPSBORN
507 Polk Street, Suite 350
San Francisco, CA 94102
(415) 771-3801
jphilipsbo@aol.com

Attorneys for Defendant DENNIS CYRUS, JR.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-05-00324-MMC |
| Plaintiff, | **REPLY TO OPPOSITION TO MOTION FOR DRUG LAB RELATED POST-CONVICTION DISCOVERY** |
| vs. | |
| RAYMON HILL, et al., | Date: August 24, 2010 |
| Defendants. | Time: 10 AM |
| | Dept: Hon. Maxine M. Chesney, District Judge |

I.  **INTRODUCTION**

The Government has now filed its opposition to Mr. Cyrus' motion for drug lab related post-conviction discovery. In doing so, it argues that: the SFPD Drug Lab is not part of the prosecution team–but even if it is, that any failure to provide further disclosures as requested by the defense is not problematic. It is up to the defense to follow-up, since the Government has obtained materials provided to it in response to a 'wide-ranging' subpoena. The Government is 'unaware' of further discoverable material. The defense motion should thus be denied.

1    The defense replies as follows. The scenario being addressed by the parties is one
2 in which the defense had sought pre-trial discovery aimed at adequately preparing the
3 defense, including any challenges to, and cross-examination of, Laboratory testing results.
4 The defense filed challenges to the drug identification and analysis testimony suggested by
5 the Government's trial disclosures by very specifically addressing: faulty procedures;
6 lacking documentation; and un-scientific procedures. In cross-examining the seven drug
7 unit analysts from the SFPD Crime Lab called by the Government, the defense specifically
8 challenged the admissibility of the testimony having elicited evidence (varying by analyst)
9 concerning the procedures employed; the lack of reliable drug weight evidence; the lack of
10 reliably documented testing; the unreliability of the procedures for drug identification and
11 weighing at the SFPD Crime Lab.
12    The Government represented that it had obtained 'all discoverable information'
13 prior to trial. When requests for discovery were re-iterated, the Government argued that
14 the defense was repeating itself, and that everything subject to disclosure had been
15 provided. Mr. Cyrus proceeded to trial–and was convicted in part (presumably) on the
16 strength of the SFPD Crime Lab analysts' drug related expert testimony.
17    Then the 'Lab Scandal' hit the SFPD Crime Lab. As demonstrated in Doc 1615,
18 and 1616 (Mr. Cyrus' initial Lab related discovery motion filed in April, 2010), there was
19 now public discussion that an analyst (who happened to have testified in this case) was
20 under investigation–and that she had alleged that in her experience there were
21 irregularities in the SFPD drug lab. In an article (filed with this Court as Exhibit G to the
22 initial Cyrus Discovery motion) entitled "Drug Lab Scandal Could Undermine Murder
23 Case", the United States Attorney for the Northern District of California, Joseph
24 Russoniello was quoted as saying that his office was reviewing a large number of papers
25 so as to make "...the appropriate disclosures at the appropriate time" (From Exhibit G at p.
26 2, filed April 27, 2010).
27    The Government did indeed disclose a pile of documents–4,200 pages plus. Most of
28 these were internal SFPD Lab documents covering the years from 2006 to 2009 (there are

a few documents pertinent to 2010). The documents are clearly more related to on-going proceedings in the local state courts–since in this case, the drug evidence analyzed went back beyond 2006.

The disclosures included the February 26, 2010 interview of the targeted analyst, Debbie Madden, was provided. The interview covers allegations that there were unexplained, recently detected, losses of portions of cocaine evidence at the SFPD Crime Lab. Ms. Madden is asked, initially in an open ended way, if she can offer some insight into the problem. Gradually, she is confronted with evidence that: several of the cases at issue could be tracked back to her; her own sister had discovered what appeared to be 'suspicious powder' in her home; other analysts had re-examined the samples, some of which were significantly altered in weight since the original testing. In addressing the situation, while Ms. Madden appears to admit some level of drug usage, the explanation(s) for the allegedly missing evidence are variable, and include the many times repeated point that cocaine drug weights in the drug lab were known to vary, even where the re-weighing was done by another analyst known to Ms. Madden, and that this phenomenon was common knowledge in the Lab. Ms. Madden, in a now much quoted answer, explained that the matter was essentially laughed at. Ms. Madden also explained that the Lab procedures were such that quality control was an issue in certain specific areas, even after efforts were made to improve the type of analysis done on drug samples–there was simply too much work. None of this was known to the defense during trial.

In addition, the current disclosures include some of Ms. Madden'files indicating that as of 2008–before she testified in this case-- she had been convicted of misdemeanors; placed on probation; and that administrative action had been taken against her on the basis that she had violated SFPD General Policy on the conduct of SFPD personnel. None of this was known to the defense.

The Madden convictions should have been revealed to the defense–as should the internal disciplinary action. But more troubling, because it went to the issues raised by the defense in this case as applied to SFPD drug analysis testimony generally, Ms. Madden

1  discussed the inconsistencies in drug weights–and that re-weighed evidence was often
2  pegged at a different weight (especially in the case of cocaine) than it was when initially
3  weighed. Weights were off. One analyst who testified in this case (Mr. Woo) was alleged
4  to be 'sloppy' in his Lab practices (and he had apparently been the supervisor of the unit at
5  one point).. And when the Department tried to institute a quality control program to tighten
6  up the reliability of testing beginning in 2008, the analysts, including Ms. Madden, could
7  not keep up. Some of the instrumental confirmatory work was simply not done. This
8  information was not known to the defense–and it certainly would have been elicited from
9  Ms. Madden given the defense's approach to the pertinent issues had it been known.

10        As demonstrated in Mr. Cyrus's summaries of the record of the testimony in this
11 case in document 1616 (the first drug lab related post conviction discovery motion), and in
12 document 1628 (the second such motion), the drug analysts testified at trial that balances
13 were calibrated by outside contractors (answers varied–once or twice a year, or no
14 frequency was given), or were checked internally (there were as many versions of this as
15 there were analysts). The impression left was that while the analysts might have been
16 forgetting the precise procedures–the existed, and could be verified. However, the March,
17 2010 audit of the narcotics unit by external auditors found that documentation pertinent to
18 calibration and instrument maintenance was problematic–it was not maintained. (The
19 defense had located this document and submitted it to the Court as Exhibit E to its April,
20 2010, discovery motion. It got a second copy with the Government's disclosures)

21        The recent disclosures demonstrate that these issues were not unknown. Internal
22 documents pertinent to quality control issues from among the 4,200 pages indicate that
23 until around 2008 the Lab did not have calibration weights to use with at least some of the
24 balances. Therefore, even assuming that there was some effort to verify balance accuracy
25 made internally–the certified weights used for the process were not maintained in the Lab.
26 Another set of reports indicates that balances were taken out of service because of
27 misunderstandings about their maintenance. Until 2008 or 2009 there were no log books
28 to indicate that the balances and other instruments were being regularly calibrated and

Reply to Opposition to Motion for Drug Lab Related Post-Conviction Discovery        4

1  maintained–and even then, when looking at the 2010 audit, it appears that the
2  documentation was not being prepared even after the Lab figured our the missing
3  calibration weight issue . Some of the documentation of these issues went back a number
4  of years (the 4,200 pages only include some quality assurance documents reaching back to
5  around 2006). The defense did not have this information at trial–though the defense did
6  ask for Laboratory related quality assurance information as part of its discovery requests.

7       The issue of drug weights was characterized by analyst Madden (who had been
8  presented to Judge Alsup in a 2006 *Daubert* hearing as a senior analyst knowledgeable
9  about drug analysis procedures) during her 2010 police interview as essentially a laughing
10 matter because of the inconsistency in drug weights when one analyst re-weighed
11 another's work. This point bears repeating in part because Ms. Madden had testified in the
12 2006 *Daubert* hearings, and then in the Cyrus case, as though the Lab moves its analyses
13 along in a professional and acceptable manner. The defense questioned her on the basis of
14 the information available to it, and the impression left with the jury, since she was quizzed
15 in part about Lab standards, was that there was noting amiss in the Crime Lab. The Court,
16 jury, and defense, did not have the benefit of the more recent information.

17      The March 2010 audit report, which the Cyrus defense offered as Exhibit E in
18 support of its April 27, 2010 discovery motion, indicates that several drug analysts were
19 interviewed in the course of the audit–including Lois Woodworth. Ms. Woodworth was
20 the first of the analysts to be presented as a witness in this case. The 2010 auditors
21 concluded that: "There is no organized maintenance/repair documentation for microscopes
22 and balances..." as had also been noted in a 2009 report. (Exhibit E at p 2). In her
23 testimony, which focused on an analysis in 2002, Ms. Woodworth stated on cross-
24 examination that the calibration of balances occurred every six months, but that she did not
25 know when the balance she used had been calibrated. (RT at 6287). While she stated that
26 there were no calibration records for 2002–it now turns out that this was an institutional
27 problem that was the subject of some measure of internal discussion. Indeed, Ms.
28 Woodworth, according to the defense understanding of the information available (which

does not reach back to 2002) would not have been able to find calibration records maintained according to Lab SOPs into 2010. This state of affairs applied to the drug unit generally. The defense was not informed of that.

It also turns out that in the aftermath of the *Daubert* hearing before Judge Alsup in 2006, some changes in procedure had been suggested–but these still remained to be accomplished as the Lab tried to keep up with its work load. Some of the changes had to do with verifying the photos of the shapes of drug crystals that would be expected to be obtained from the type of testing done in the SFPD Crime Lab.

None of this crucial information was in the hands of the Cyrus defense prior to, or during, the trial. And, of course, none of the analysts made the situation just described clear. Neither Ms. Madden nor Ms. Woodworth addressed the Lab Practices the same way they apparently did when dealing with police officers, or auditors, when the Lab Scandal broke.

A motion for new trial can be based on newly discovered evidence where: the evidence is newly discovered; the failure to discover it is not due to a lack of defense diligence; the evidence is material to the issues at trial; it is not cumulative or merely impeaching; a new trial would probably result. *United States v. Kulczyk*, 913 F. 2d 542, 548-9 (9th Cir, 1991).

The defense is pursuing grounds for a new trial on at least some of the Counts that are implicated by testimony given by the SFPD Lab analysts. The Government's position is essentially that now that it had forked over materials that have been assembled pursuant to a subpoena, regardless of whether there are serious issues concerning the evidence that it presented, the problem is now the defense's. The defense respectfully disagrees.

The defense has asked for specific disclosures–and specific follow up. The Government has been encouraged by the Court to follow up. The Government is apparently not inclined to do so. The defense is of the view that it is entitled to have the Government directed to make specific further inquiries. If these prove fruitless, then the defense will take what steps it can to perfect Mr. Cryus' record.

## II. ARGUMENT AND AUTHORITIES

The Government wants to distance itself from responsibility to obtain further information concerning its SFPD Lab witnesses. It also wants to minimize its post-conviction disclosure duties. It cannot do so under the present circumstances. *Brady v. Maryland*, 373 U.S. 83 (1963) applies post-conviction - the information in the *Brady* case itself (a statement attributed to the co-defendant that he, and not Brady, had shot the victim) was discovered by the defense after conviction. What is sought here is the acknowledgment of *Brady* disclosure responsibility placed on the Government by a series of cases, including *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) which held that the responsibility for *Brady* compliance lies exclusively with the prosecution, including the "duty to learn of any favorable evidence known to others acting on the government's behalf in the case."

The SFPD Crime Laboratory acted as part of the prosecution team. Indeed, as conceded by the Government at the last calling of this case, Ms. Madden re-weighed drug evidence at the Government's request in 2009 before she testified. However, when she testified, the defense did not have the information in hand to address the issues she would later explain to police officers–drug weights, as the SFPD Crime Lab arrived at them were variable. And the defense was unaware that the Lab's internal documents indicated that what information about calibration should have existed was not being documented and maintained–and that internal calibration on some balances could not have been reliably demonstrated. The Fifth Circuit recognized in *U.S. v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980), that courts have consistently declined to draw a distinction between different agencies functioning under the umbrella of the prosecution team.

Trial courts, including the trial court in the Oklahoma City bombing case, have allowed post-conviction discovery. In the bombing case, the defense was allowed to review the lead sheets that had been generated during the course of the investigation, prior to a hearing on a motion for new trial, and which were discussed not only during trial, but during proceedings related to a Rule 33 motion. The court allowed the defendant the

Reply to Opposition to Motion for Drug Lab Related Post-Conviction Discovery 7

opportunity to review material that he claimed was pertinent to the integrity of the convictions, though the court eventually rejected the motion for new trial. *U.S. v. Nichols*, 67 F.Supp.2d 1198, 1199-1200 (D.Colo. 1999).

*U.S. ex rel Smith v. Fairman*, 769 F.2d 386 (7th Cir. 1985) involved a gun that the accused had allegedly used to shoot at two police officers and commit a robbery. However, the gun expert who had examined the gun had test-fired it the day after the shooting, and found it to be inoperable. *Id.* at 389. The officer failed to include this finding in his report, which was placed in the investigative files and not disclosed to the prosecutor or to the defendant. The reviewing court found that the prosecutor had no knowledge of the evidence, but on considering it post-conviction, it held that the evidence of inoperability must be viewed as material exculpatory evidence, notwithstanding the fact that the prosecutors did not know of it. "The fact that the prosecutor in this case was blameless therefore does not justify the State's failure to produce [the] firearms worksheet." *Id.* at 391-392.

As the Ninth Circuit observed in *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004) "Even a prompt disclosure after the verdict would have been useful in supporting defendant's motion for new trial." That observation pertains in this case. *Gantt* involved a murder/robbery case. The only physical evidence in the crime was a matchbook that had a number written inside of it. The prosecution's position was that the defendant had lifted the matchbook off the victim. There were questions about how a particular phone number would have come to be in the matchbook - and whether the phone number could be shown to have been written in the matchbook. Towards the end of trial, the prosecutor was informed by investigators that an attempt had been made to track down the number - which led law enforcement officers to someone who could not identify the victim from a photograph, thus undermining the prosecution's theory of the significance of the defendant's possession of the matchbook. The initial ruling on this issue by a District Court was that it had been up to the defendant, not the Government, to investigate the information at issue. The Ninth Circuit disagreed, remanding the case for a hearing on

1 whether the Government had failed to disclose the information, which the Ninth Circuit
2 found to be *Brady* evidence.
3 While it did so in a civil rights case issuing from a criminal investigation, the Fifth
4 Circuit held that a police lab tech who created a misleading and inaccurate paper trail
5 leading to the conviction of a person who could have been exonerated by reliable
6 information should be viewed as having suppressed exculpatory evidence. *Brown v. Miller*
7 519 F. 3d 231, 237-8 (5th Cir, 2008).
8 Clearly, the 2009 site visitors from ASCLD [whose report was acknowledged in the
9 March 2010 police lab audit], as well as the specifically commissioned SF Crime
10 Laboratory auditors in March, 2010, had concerns about quality assurance and
11 documentation issues at the San Francisco Police Department Crime Laboratory.
12 Essentially, it turns out that the defense was right that there were reliability issues with
13 SFPD Crime Lab drug related evidence. But deprived of sufficient information (some of
14 which, admittedly, the Government has now obtained and provided) at the time of trial, the
15 defense was unable to demonstrate to the Court, and to the jury, the further bases for its
16 objections, and positions that the drug related lab evidence was insufficient to sustain
17 convictions.
18 There is additional information referenced in the recently disclosed
19 discovery–particularly: interviews of other criminalists in connection with the March,
20 2010 audit; likely follow up to Madden's allegations, in which she suggested that the
21 police confer with analyst Woodworth about them; follow up to Madden's allegation that
22 the 'new' (2008) quality assurance program was never actually implemented because of
23 work load, and that analysts were not using confirmatory testing. . The Government could
24 at least make the effort to attempt to obtain it to further allow inquiry into the integrity of
25 its evidence during the trial of this case. Clearly, either the Government was not provided
26 all of the material that should have been revealed, or the Government failed to make
27 sufficient inquiry into its existence. Given the close relationship of the SFPD and the
28 Government in this case (after, the existence of a Memorandum of Understanding between

Reply to Opposition to Motion for Drug Lab Related Post-Conviction Discovery 9

1 the two agencies was conceded by at least one law enforcement witness), the
2 Government's failure to follow up is more than puzzling–it is violative of Mr. Cyrus's
3 Fifth and Sixth Amendment rights.
4     If, after further inquiry, it turns out that the materials referenced by the defense do
5 not exist, then the next step of the proceedings can be addressed.

## CONCLUSION

7     For the reasons stated here, the defense urges the Court to Order discovery as
8 requested.

Dated: August 18, 2010

                                                  Respectfully submitted,

                                                  JAMES S. THOMSON
                                                  JOHN T. PHILIPSBORN

                                                  By <u>s/John T. Philipsborn</u>
                                                      Attorneys for Defendant
                                                  DENNIS CYRUS, JR.

**PROOF OF SERVICE**

I, Steven Gray, declare:

That I am over the age of 18, employed in the County of San Francisco, California, and not a party to the within action; my business address is Suite 350, 507 Polk Street, San Francisco, California 94102.

On today's date, I served the within document entitled:
**REPLY TO OPPOSITION TO MOTION FOR DRUG LAB RELATED POST-CONVICTION DISCOVERY**

( )   By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, CA, addressed as set forth below;
(X)   By electronically transmitting a true copy thereof;
( )   By having a messenger personally deliver a true copy thereof to the person and/or office of the person at the address set forth below.

Robert Rees
William Frentzen
Assistant United States Attorneys
Office of the United States Attorney
450 Golden Gate Avenue, 11th Floor
San Francisco, CA 94102

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of August, 2010, at San Francisco, California.

Signed:   /s/ Steven Gray
          Steven Gray