1  JAMES S. THOMSON, ESQ. - SBN 79658
   Law Offices of JAMES S. THOMSON
2  819 Delaware Street
   Berkeley, CA 94710
3  (510) 525-9123
   james@ycbtal.net
4
   JOHN T. PHILIPSBORN, ESQ. - SBN 83944
5  Law Offices of JOHN T. PHILIPSBORN
   507 Polk Street, Suite 350
6  San Francisco, CA 94102
   (415) 771-3801
7  jphilipsbo@aol.com

8  Attorneys for Defendant DENNIS CYRUS, JR.

9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )   Case No.  CR-05-00324-MMC
                                       )
14          Plaintiff,                 )   MEMORANDUM OF POINTS AND
                                       )   AUTHORITIES IN SUPPORT OF
15  vs.                                )   MOTION FOR NEW TRIAL BASED
                                       )   ON NEWLY DISCOVERED
16  RAYMON HILL, et al.,               )   EVIDENCE (FRCP 33)
                                       )
17          Defendants.                )   Time: 1:30 p.m.
                                       )   Date:  November 19, 2010
18  _____   )   Dept:  Hon. Maxine M. Chesney,
                                                  District Judge
19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION .............................................  1

II.     PROCEDURAL AND FACTUAL BACKGROUND ................  1

        The impact of the *Diaz* litigation on this case ......................  3

        The defense discovery efforts ...................................  5

        The drug evidence-related *Daubert* motions ........................  8

        The redacted Superseding Indictments ...........................  9

        The trial testimony of SFPD drug analysts .......................  10

III.    ARGUMENT AND AUTHORITIES IN SUPPORT OF THE
        GRANTING OF A NEW TRIAL ON COUNTS DEPENDENT ON
        THE COMBINATION OF DRUG IDENTIFICATION AND
        WEIGHT TESTIMONY ......................................  15

        There was a wealth of material not made available to the defense ......  15

        The Ninth Circuit test favors a new trial in this case ................  17

        A *Brady* violation occurred in this case ..........................  20

        Newly discovered evidence would have produced an acquittal on
        counts that depended on drug weight and drug identification evidence  ..  22

        The impact of the newly discovered and undisclosed evidence in this
        case is assessed under two related tests ..........................  23

        The issue of drug weight and identification is critical in federal court
        because it has sentencing ramifications ..........................  24

        CONCLUSION ............................................  24

1                          **<u>TABLE OF AUTHORITIES</u>**

2  **<u>Federal cases</u>**

3  *Apprendi v. New Jersey*, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

4  *Blakely v. Washington*, 542 U.S. 296 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

5  *Brady v. Maryland*, 373 U.S. 83 (1963)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20, 22

6  *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) . . . . . . . . . .   7, 8, 16, 19

7  *Giglio v. U.S.*, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

8  *Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21, 23

9  *Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

10  *Smith v. Secretary Department of Corrections*, 50 F.3d 801 (10th Cir. 1995) . . . . . . . .   21

11  *U.S. v. Agurs*, 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

12  *U.S. v. Alvarez*, 86 F.3d 901 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

13  *U.S. v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

14  *U.S. v. Brooks*, 966 F.2d 1500 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

15  *U.S. v. Davis, et al.*, 960 F.2d. 820 (9th Cir., 1992) . . . . . . . . . . . . . . . . . . . . . . . . .   17, 18

16  *U.S. v. Diaz, et al.*, CR-05-00167 WHA . . . . . . . . . . . . . . . . . . . . . . .   3, 4, 6, 7, 16, 19, 24

17  *U.S. v. Kulczyk*, 931 F.2d 542 (9th Cir., 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

18  *U.S. v. Payne*, 63 F.3d 1200 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

19  *U.S. v. Pelullo*, 105 F.3d 117 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

20  *U.S. v. Walgren*, 885 F.2d 1417 (9th Cir., 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . .   17, 23

21  *United States ex rel Smith v. Fairman*, 769 F.2d 386 (7th Cir. 1985) . . . . . . . . . . . . . .   21

22  **<u>U.S. Code</u>**

23  18 U.S.C. §9224(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

24  **<u>FRCP</u>**

25  16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

26  33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

27  **<u>Texts</u>**

28  "Disciplinary Penalty and Referral Guidelines" SFPD . . . . . . . . . . . . . . . . . . . . . . . . . .   15

1  JAMES S. THOMSON, ESQ. - SBN 79658
   Law Offices of JAMES S. THOMSON
2  819 Delaware Street
   Berkeley, CA 94710
3  (510) 525-9123
   james@ycbtal.net
4
   JOHN T. PHILIPSBORN, ESQ. - SBN 83944
5  Law Offices of JOHN T. PHILIPSBORN
   507 Polk Street, Suite 350
6  San Francisco, CA 94102
   (415) 771-3801
7  jphilipsbo@aol.com

8  Attorneys for Defendant DENNIS CYRUS, JR.

9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,      )   Case No.  CR-05-00324-MMC
                                   )
14        Plaintiff,               )   MEMORANDUM OF POINTS AND
                                   )   AUTHORITIES IN SUPPORT OF
15  vs.                            )   MOTION FOR NEW TRIAL BASED
                                   )   ON NEWLY DISCOVERED
16  RAYMON HILL, et al.,           )   EVIDENCE (FRCP 33)
                                   )
17        Defendants.              )   Time: 1:30 p.m.
                                   )   Date:  November 19, 2010
18  _____ )   Dept:  Hon. Maxine M. Chesney,
                                            District Judge
19

20  I.    INTRODUCTION

21        The defense moves for a new trial on two grounds.  First, there is newly discovered

22  evidence that fits the Ninth Circuit test for the granting of a new trial under FRCP 33.

23  Second, there was exculpatory and discoverable information from a law enforcement

24  agency that was not timely provided to defense counsel that is sufficient to warrant a new

25  trial.

26  II.   PROCEDURAL AND FACTUAL BACKGROUND

27        This Motion has been anticipated by the Court and the parties, since the disclosure,

28  earlier this year, of an investigation into certain problems at the San Francisco Crime

1   Laboratory.  These developments were first brought to the attention of the defense by

2   newspaper coverage.  Subsequently, as is reflected in Exhibit A to a post-conviction

3   discovery motion filed by the defense on April 27, 2010, Mr. Frentzen contacted

4   undersigned counsel by email asking whether the undersigned was aware of media

5   coverage concerning allegations which were initially centered on a long-time criminalist

6   with the San Francisco Police Crime Laboratory (hereinafter "SFPD Crime Lab"),

7   Deborah "Debbie" Madden.  This led to a series of defense efforts to investigate the so-

8   called "SFPD Lab Scandal."

9           These efforts included: the defense's collection of media information; attendance at

10  meetings that involved former SFPD Crime Lab employees; consultations with members

11  of the San Francisco criminal defense bar; attendance at a meeting with the San Francisco

12  Public Defender; informal attempts at obtaining and reviewing Court Orders and pleadings

13  generated in the course of Crime Lab-related litigation in San Francisco's local Superior

14  Courts; review of local Court records; review of at least one other Federal case in which

15  an allegation of SFPD Crime Lab problems surfaced in the aftermath of Mr. Cyrus'

16  convictions.  The efforts also included the filing of an April 27, 2010 discovery motion

17  (Doc. 1615); the filing of a second motion for post-conviction discovery seeking an Order

18  bearing on the validity of convictions (Doc. 1628, filed July 20, 2010); and a number of

19  written exchanges consisting mainly of letters addressed by the defense to the Office of the

20  United States Attorney seeking evidence and information.  The defense also contacted

21  members of the local media; conferred with counsel for former SF Crime Lab criminalist

22  Debbie Madden and various lawyers litigating SFPD Crime Lab issues.

23          In addition to having obtained some laboratory audit reports, numerous articles

24  from media sources, copies of various pleadings filed in State Court proceedings involving

25  SFPD lab issues, examples of SFPD Crime Lab problems from the Officer of the San

26  Francisco (County) Public Defender, the defense also obtained from the Government

27  approximately 4,200 pages of materials concerning the SFPD Crime Lab.  These 4,200

28  pages were furnished <u>after</u> the completion of the case, <u>after</u> jury verdicts, and, indeed, <u>after</u>

1  the filing of the first defense post-conviction motion focused on the SFPD Lab Scandal

2  (Doc. 1615, filed April 27, 2010).

3       The record of this case is clear, and it is doubtful that the Government will contest,

4  that from the beginning of defense counsels' involvement in the Cyrus case, numerous

5  written requests for disclosures, including discovery bearing on the veracity of witnesses;

6  disclosures specific to the SFPD Crime Laboratory, and the like, were generated by the

7  defense.  At the defense's request, the Government made arrangements so that all the case

8  evidence could be viewed.  Certain evidence was transmitted to a defense criminalist by

9  the Federal Bureau of Investigation.

10       Dissatisfied with early Government disclosures, the defense repeatedly sought

11  access to information concerning the reliability and validity of the Government's evidence.

12       Notwithstanding these efforts, the Government relied on the San Francisco Police

13  Department to provide information–knowing that there had been one challenge to the

14  SFPD's drug identification methodology brought in Federal Court, Northern District of

15  California, which had exposed the very spare documentation used by the laboratory to

16  document drug testing; issues of quality control in multiple package drug testing due to

17  lack of testing of all packages; and the lack of confirmatory instrumental testing.

18       Ironically, one of the witnesses proffered by the Government during the course of

19  the hearing that pre-dated this litigation was Debbie Madden, the woman whose alleged

20  theft of cocaine evidence was at the root of the SFPD Crime Laboratory scandal of 2010.

21       **The impact of the *Diaz* litigation on this case**

22       On December 12, 2006, the Honorable William Alsup filed an "Order Denying

23  Motions to Exclude Drug Identification Expert Testimony For Lack of Foundational

24  Materials" in what was then a multiple defendant case that had largely been investigated

25  by the San Francisco Police Department (Doc. 1064, *U.S. v. Diaz, et al.*, CR-05-00167

26  WHA).  One of Mr. Cyrus' lawyers was among several defense lawyers involved in the

27  *Diaz* drug identification expert hearings.  The first *Diaz* drug evidence Order addressed

28  only specified, limited, issues.  Judge Alsup explained:

1    This order addresses issues related to the San Francisco Police Department
     Crime Lab's narcotics-analysis documentation and the destruction of some
2    of the suspected narcotics evidence in this case.

3    (*Diaz*, Doc. 1064 at p. 1.)

4        Judge Alsup also ruled on a second major challenge brought in the *Diaz* case and

5    related to drug identification.  But that challenge centered on whether the methodology

6    used to identify marijuana and cocaine in the SFPD Crime Lab was defective, and a

7    related issue was raised on whether the laboratory reports prepared by the analysts were

8    insufficient.  Judge Alsup issued an "order denying in part and granting in part motions to

9    exclude drug identification expert testimony" at the end of an evidentiary hearing (*U.S. v.*

10   *Diaz*, *supra*, Doc. 1059, filed December 6, 2006).  While acknowledging that

11   "...instrument techniques are ideal for drug-identification testimony in Court," in part

12   because they can independently be re-analyzed by a different analyst, nonetheless, Judge

13   Alsup found that the techniques used by the San Francisco Police Department for

14   marijuana and cocaine identification were sufficiently reliable to admit the evidence (*Diaz*

15   Doc. 1059 at pp. 23-24).

16       However, Judge Alsup also noted that: "At the hearing, a small bombshell

17   exploded.  Criminalist Deborah Madden testified that the SFPD Crime Lab failed to test

18   all packages of suspected marijuana" (*Diaz*, Doc. 1059 at p. 24:22-23).  Testing only one

19   of several packages of marijuana was an invalid procedure according to Judge Alsup, and

20   therefore, the Court found that acceptable methodology was not being applied to multiple-

21   package samples (*Diaz*, Doc. 1059 at p. 26:10-11).

22       The *Diaz*-related drug hearings did not address drug weight-related issues, and thus

23   none of Judge Alsup's Orders addressed those issues.

24       However, armed with the knowledge that there were issues at the San Francisco

25   Crime Lab warranting further inquiry, in defending this case the Cyrus defense not only

26   sought all the discovery it could obtain through the office of the United States Attorney,

27   but also reviewed the material that had been disseminated in the context of the *Diaz* case

28   (setting aside protected information dealing with specific categories of protected

1   witnesses) and in other cases, to educate itself on the issues.

2       **The defense discovery efforts**

3       The defense's first letter addressing physical evidence issues specifically expressed

4   concern to avoid destruction of any material in the hands of the San Francisco Police

5   Department.  It was addressed to AUSAs Phil Kearney and Andrew Scoble on August 8,

6   2005.  They were the first assigned prosecutors.

7       The first written discovery request was made on August 18, 2005, and among other

8   things, it requested all results and reports of physical, mental, and/or scientific

9   examinations including any "testing of any suspected controlled substances" (August 18,

10  2005 letter at p. 1).

11      A number of letters were sent to Assistant U.S. Attorney Phil Kearney seeking to

12  ensure the preservation of any physical evidence and notes "including laboratory

13  materials"–referenced in an August 7, 2006 letter to Mr. Kearney.

14      The Cyrus defense then filed a Motion for Pre-Trial Discovery Order, including

15  discovery specific to death-eligible defendants–the first major discovery motion brought in

16  the case after death eligibility was an issue.  This lengthy document is in the record as

17  Doc. 128, and includes several of the initial discovery letters addressed to the Government

18  by the defense.  The discovery motion contained detailed requests, rooted in Rule 16,

19  concerning copies of scientific evidence tests and reports, including a request for raw

20  material and other information of sources considered by the examiner, the methodology

21  used, all worksheets, notes and other materials used to assist the examiner in reaching an

22  opinion (Doc. 128 at p. 7:paragraphs 8 and 9).

23      The motion for discovery was followed by a June 2, 2006 (Doc. 181) Motion to

24  Preserve All Notes Taken By Law Enforcement Officers and All Physical Evidence

25  Seized, Processed or Examined.  This motion to preserve had been required because

26  several items of evidence related to the case, including drug evidence, were destroyed

27  either prior to the filing of federal charges, or after that filing - a matter that was of

28  concern to the defense–and remains so.

On March 23, 2007 the defense sent a letter to AUSAs Lowder, Keller and Frentzen (then assigned to this case) related to DNA evidence, alluding to the defense's review of quality control manuals and the like, and details of laboratory-related issues.  The defense concluded the letter at issue (three pages long) asking for the Government's assistance in obtaining further documentation.

On June 22, 2007 the defense addressed a letter to Mr. Keller, Mr. Frentzen and Mr. Rees (the configuration of prosecutors had changed by that date) explaining concerns about documentation from the drug lab, noting that the defense was concerned to find out (in the aftermath of the *Diaz* litigation, above) where the laboratory was able:

> ...to match the brief, conclusory one-page 'computer' printout on weight and drug identification with more descriptive worksheets. The worksheets then were cross-referenced to laboratory documents describing the appearance of drug crystals, and other drugs.  My review of the discovery indicates that we do not have this foundational information, and that we have no 'organized' section of the hard copy discovery which would assure us that we would have the available documentation.

(Page 2 of the letter.)

On July 11, 2007, the defense addressed Assistant U.S. Attorneys Keller, Frentzen and Rees, explaining that certain material:

> ... related to your likely experts that has yet to be furnished, including but not limited to: foundational materials related to drug offenses (meaning laboratory drug testing SOPs; designation of drug experts; proposal for testimony with respect to counts or acts involving destroyed drug evidence; the furnishing of laboratory documents pertinent to the testing of specific drugs, including documentation contemporaneously produced by technicians and criminalists evidencing their adherence to the SFPD Laboratory drug testing protocols.

(July 11, 2007 letter at p. 2.)  There was a request to make arrangements to get documentation of any confirmatory testing "that involves something other than presumptive tests conducted with chemical reagents. " (also from p. 2).

On August 7, 2007 the defense addressed to Mr. Frentzen and Mr. Rees a letter that was labeled as its Eighteenth Pre-Trial Request for Further Discovery.  In it, the defense

1 indicated specific categories of issues likely to be litigated as *Daubert* issues, and the

2 related disclosures that had yet to be made.  At p. 4 the defense included a head-note

3 covering "drug identification, and weight."  The defense noted that it had requested all

4 bench notes that were used:

> This means, as far as we are concerned, that as to each drug that will
> be identified, or described by chemical constituence and weight, or
> that may be the subject of some testimony, documentation kept
> pursuant to the SFPD Crime Lab's SOP should be provided.

(Page 4, first full paragraph of August 7, 2007 letter.)

Significantly, the defense then went on to state:

> ...It appears that are many instances in which we have not been
> furnished with the documentation that the SFPD Crime Lab claims to
> generate in connection with identification, or even processing, of
> suspected drugs.
>
> In addition, we have none of the material pertinent to analyst
> proficiency testing; investigations of practices and procedures in the
> SFPD Crime Lab; descriptions of changes in SOPs in connection with
> the accreditation processm which took place at a time that would
> impact the evidence in this case–since the lab was accredited only
> recently, and since there were changes in procedures that occurred
> during the years between 1994 and 2005, the years charged in the
> conspiracies.

(p. 4, August 7, 2007 letter.)

The defense explained that the issue had been discussed with Mr. Frentzen and that

the defense understood that "there are difficulties in extracting information from the SFPD

Crime Lab," but nonetheless, such material had been obtained in the *Diaz* (see above)

case.  "Thus, it is surprising that it has not been disclosed here, in part because the two

cases were on parallel tracks at the time we litigated the *Daubert* matters in *Diaz*."  (From

p. 4 of August 7, 2007 letter.)

The defense's files indicate that more than 150 letters were sent by the defense to

the Government–admittedly not all related to the issues raised here. However, many of

these letters reference very specific requests for discovery of pertinent material, including

requests related to laboratory testing issues (including drug evidence-related requests).

The Cyrus defense subsequently brought a motion for discovery specific to Mr.

1    Cyrus' status as a death-authorized defendant, and several supplemental motions addressed

2    discovery as well.

3           **The drug evidence-related *Daubert* motions**

4           Prior to trial, the defense filed a motion to exclude drug-related evidence based on

5    laboratory work where (a) there is no current recollection of the work; (b) there is

6    insufficient documentation to establish use of acceptable and valid methods; and (c) where

7    the defense had no opportunity to re-test suspected drugs.  This was Defense Trial Motion

8    18.  The defense emphasized that it was hard to tell in a number of instances whether there

9    had even been compliance with the SFPD Crime Lab SOPs.  The defense explained at p.

10   12 of the pleading:

11                    In this case, however, only some of the information about proficiency
                     testing, competency testing, or documentation of the various steps is
12                   made available, most specifically in connection with DNA testing.

13   This section of the pleading began with a description of the 2005 'quality assurance

14   program' as described in the 2005 drug-related SOPs, which explained the defense's

15   awareness that the SOPs required the logging of certain reagent preparations and

16   verifications of certain standards.

17          The body of the argument, however, complained that information that theoretically

18   was required by the SOPs had not been available in this case, with the exception of the

19   DNA testing issues.  In the pleading, the defense expressed concern not only about the

20   Lab's paltry requirements of documentation, but noted that "...the documentation itself

21   allows for no independent review, other than the ascertainment that a form was filled out

22   by an analyst."  (The references are from p. 12, *re* the quality assurance and conformity

23   with SOP issues, and p. 17 with respect to the insufficiency of the documentation

24   produced.)  The defense specifically asked the Court, in the aftermath of asking for the

25   exclusion of the narcotics evidence, that the Court should at least:

26                    ...order the Government to provide the documentation, particularly
                     with respect to the quality control issues (setting up of testing,
27                   cleaning of the laboratory areas, setting up of chemical solutions,
                     quality assurance, proficiency testing).
28

1  (P. 18 of the August 28, 2008 pleading.)

2       A separate pleading, Trial Motion 20, sought to exclude forensic science testimony

3  concerning drugs and firearms where the suspected drugs (and firearms) had been

4  destroyed, and the basis for any opinion was unreviewable.  The defense made reference to

5  the various standards that governed the laboratory testing of drugs, including SWGDRUG

6  (Scientific Working Group for Drugs) recommendations that the paperwork be sufficient

7  to allow independent verifications.  (Trial Motion 20 at pp. 7-8.)

8       **The redacted Superseding Indictments**

9       Mr. Cyrus was tried on the charges set forth in Document 1222, which was a

10  Redacted Indictment, filed February 20, 2009.  The Redacted Indictment charged Mr.

11  Cyrus in Count One with conspiracy to distribute and possess with intent to distribute 50

12  grams or more of cocaine base in the form of crack; many of the overt acts appended to

13  Count One alleged distribution and/or possession with intent to distribute specified

14  weights of cocaine.

15       Count Two charged a conspiracy to participate in a RICO organization.  Some of

16  the allegations were rooted in the conspiracy with intent to possess and distribute mixtures

17  of crack cocaine where the quantity of said mixture was 50 grams or more; detectable

18  amounts of cannabis; detectable amounts of ecstacy.  Several of the racketeering acts

19  allege possession or possession with intent to distribute specified weights of drugs.

20       Count Three was a violent crime in aid of racketeering (hereafter, "VICAR"),

21  alleging the attempted murder of Marcus Atkinson; Count Four was a VICAR offense

22  alleging an assault with a deadly weapon on Mr. Atkinson; Count Five was a VICAR

23  offense alleging the murder of Joseph Hearns; Count Six was VICAR offense alleging the

24  kidnaping of Mr. Hearns; Count Seven was a VICAR offense charging the murder of

25  Randy Mitchell; Count Eight is a VICAR offense alleging the murder of Ray Jimmerson.

26       Counts Nine and Ten were variations of witness murder and witness retaliation,

27  both involving Mr. Jimmerson.

28       Counts Eleven and Twelve relate to an August 31, 2002 possession of 5.88 grams

1  of cocaine (Count Twelve is the possession with intent to distribute cocaine base).

2      Counts Thirteen to Sixteen are violations of 18 U.S.C. §9224(c)(1)(A), use of a

3  weapon in relation to a crime of violence.

4      The jury returned "Guilty" verdicts on all counts prior to its consideration of the

5  death penalty.

6      **The trial testimony of SFPD drug analysts**

7      The testimony pertinent to this motion began on March 24, 2009 with the

8  appearance of Lois Woodworth, a criminalist who had worked at the SFPD Crime Lab for

9  eight years. She possessed a B.S. degree. She described SFPD laboratory procedures, and

10  the analytical methodology employed with suspected cocaine (Ms. Woodworth testified on

11  March 24 and 25, 2009. Her testimony is in transcript Volumes 29 and 30). According to

12  her, once the suspected drugs were in the lab, the law enforcement packaging was opened

13  (RT 6205), a suspect evidence weight was recorded. The analyst then proceeded with

14  testing. With suspected cocaine base, a presumptive and two confirmatory tests were

15  done. These tests produced reactions that had to be observed and noted by the analyst. It

16  was also possible to do confirmatory instrumental testing that produced spectra in the form

17  of a print out (RT 6213).

18      The usual drug analysis results would be recorded on pre-printed lab forms, some

19  of which would be reviewed to ensure that there were no spelling errors and that the form

20  was properly signed and dated (RT 6237). Some of the data would be entered into the

21  electronic recording system called "Cable." RT 6238. Ms. Woodworth had no

22  recollection of these specific test results, and explained what she would have seen when

23  she obtained positive results for cocaine. RT at 6248-52.

24      Over objection, Ms. Woodworth testified to her analysis in two different cases,

25  including one in the name of Dennis Cyrus, Jr.

26      Ms. Woodworth acknowledged that the SFPD Crime Lab was a "high throughput

27  operation." RT 6266. She would work on 10 to 20 drug cases a day. Unless instrumental

28  analysis through the use of gas chromatograph mass spectrometer was done, analysts relied

on presumptive and microcrystalline tests.  Analysts would then reference the 'standard crystal forms' that were provided in the lab's SOPs.  RT at 6272-6278.  The only documentation that could be reviewed would be "... handwriting on a Crime Lab narcotics analysis report form."  RT 6271:5-7.  The only way an independent scientist would have of knowing what occurred in a given analysis would be to be familiar with the lab operating procedures and to discuss a particular test with the analyst.  RT 6272:9-19.

The 'technical review' of the paperwork produced was the confirmation of correct entries on a lab sheet.  It was only required to be done in about 10 percent of the cases.  RT 6285-86.

According to Ms. Woodworth, the scales or balances that were in use to weigh suspected drug evidence when she did her 2002 analysis in this case would have been calibrated every six months, but she had no idea when the balance she used was calibrated, and there was no record kept of the calibration process.  RT 6287.[1]

The next lab witness was Corbin Yem.  He was an analyst at the drug lab between 1994 and 2000, had worked on about 30,000 drug cases during his career.  RT 7192.  His testimony was given on April 6, 2009, and is in Volume 36.  He testified about two case-specific analyses, noting that given his routine, he would have done a presumptive test and two confirmatory tests.  He had no specific recollection of his work on this case.  RT at 7195 - 96.  He would have logged in most of the entries on the Cable system, though some of the entries would have been generated before he worked on the case.  RT 7210-11.  The only documentation he produced was a one-page pre-printed lab report.  The lab was not accredited when Yem was there.  RT at 7213.  As for drug weight issues, Yem said that the scales and balances would have been calibrated by someone else.  He did not know when the balances were calibrated.  RT at 7214.  He had no documentation showing any calibration.  RT 7214.

---

[1] As it turns out, this was testimony was proven accurate by post-conviction discovery.  It stands in contrast to the testimony of the other analysts, whose recollections and accounts varied on this issue.

1    Next was Michael Tan, a retired SFPD criminalist.  He had also done thousands of

2  suspected drug cases (Transcript, Volume 36, 4/6/09).  He testified about analyses he did

3  in 1998 and 2002 as pertained to this case.  He did not recall the analyses, but he said he

4  would have done a presumptive test and two confirmatory tests for cocaine, and would

5  have looked at the structure of a suspected marijuana leaf and would have done some

6  confirmatory testing.  He did not believe he would have done any instrumental testing to

7  confirm his other findings.

8    Asked about his recollection of the balance calibration process in 1998 and 2002,

9  he felt the balances were calibrated at least once a year, "maybe even sooner."  He testified

10  that he imagined "but I'm not quite sure" that the lab had calibration records for the years

11  of his tests (1998 or 2002).  RT 7249-52.

12    Debbie Madden, a criminalist at the Lab, testified about drug analyses done in

13  2000, 2001, 2002, and 2009 - the last of these being further testing on a sample involving

14  Dennis Cyrus (she also testified on April 6, 2009, Volume 36).  She said she would have

15  recorded weights for suspected drugs, and done a presumptive and two confirmatory tests

16  for suspected cocaine, though she had no recollection of the specific tests she did.  She had

17  not noted, with one exception, whether the weights were net or gross.  She had done one

18  confirmatory instrumental analysis with a gas chromatograph on one of the drug samples

19  (RT 7277-78).  She could not recall why she had done the instrumental testing, and she

20  had no idea where the documentation, or spectra, for the gas chromatograph test was

21  located.  RT 7295.

22    The only documentation of a drug analysis that she would have normally produced

23  would have been the notes on the one-page pre-printed SFPD Lab drug analysis form,

24  though the instrumental analysis should have had a separate printout.

25    As for the confirmation of drug weights, she thought that the balance was calibrated

26  twice a year by the company, and checked by the laboratory every month.  She was of the

27  view that one could check the "QC sheets" and tell whether a balance was calibrated

28  within the lab's required range.  RT at 7304-05.  She did not know what the parameters of

1  error for the calibration process were.  She had no record of calibration for any of the

2  balances involved.  RT 7304-06.  Ms. Madden also confirmed that none of the

3  presumptive or confirmatory testing was photographed.  Significantly, given the post-

4  conviction discovery, when asked whether the nature of the documentation that the lab

5  produced in connection with drug analyses might change in the future, Ms. Madden

6  responded that she was "sure things will keep changing."  RT at 7308.[2]

7        Daniel Lee testified next.  He had worked at the SFPD Crime Lab from 1974 to

8  2000 (Volume 36).  He was asked to testify about his work on a 1998 case, and on another

9  in 1999.  One was a suspected marijuana case, and the other a suspected cocaine case.  He

10  had identified the marijuana through microscopic and color reagent tests, and the cocaine

11  through the presumptive and confirmatory testing.  He noted that with the confirmatory

12  testing "... a picture is worth a thousand words," (RT 7325) though there were no pictures

13  taken of his analyses.  He had no documentation beyond the lab sheets, and had done no

14  instrumental analysis.

15        As for the balances and scales used to weigh substances, he stated that some were

16  calibrated by an outside contractor and others were checked internally (RT 7334-35).  He

17  could not recall if any record of calibration was kept, and was not asked to review the

18  calibration related to his work prior to testifying (RT 7335-36).

19        Francis Woo testified next.  He was the supervising criminalist at the SF Crime

20  Lab.  He had just retired after 33 years of service (Volume 37, April 7, 2009).  He had

21  been in charge of the narcotics and chemical section since 2001, and was asked about

22  analyses that he had done in 1996, 1997, and 2001 in the context of this case.  He could

23  not recall the specific testing in this case, but said he usually would have written net

24  weights, but had not recorded specific weight categories on his lab sheets in this case.  He

25  _____

26        [2] Ms. Madden's response is noteworthy for several reasons.  First, unbeknownst to the
    defense, as far back as 2006 internal audit reports signaled the need for changes in the
27  documentation process.  Second, in 2009 and 2010, the ASCLD audit and external auditors
    (2010) noted the lack of documentation pertinent to instrument maintenance, and the need
28  (ASCLD, 2009) for better documentation of the actual testing.

1  too had tested suspected cocaine with presumptive and confirmatory testing. While he
2  believed he would have made bench notes at the time of his testing, he no longer had them,
3  and the only thing he would have had to document his work were the pre-printed lab forms
4  he had filled out.

5      Asked about the balance calibration process, he testified that the calibration was
6  done by an outside source at least once a year, and monthly internally. RT 7377. The lab
7  would have had a record of the calibration, but he had not been asked to bring any
8  calibration information. RT 7377.[3]

9      It would have been possible to take photographs of the analyses, but these were not
10  taken as a matter of routine, in part because of the case load, and because of the time it
11  would have taken to photograph the test results. RT 7383-84.

12      Ralph Whitten, who had been at the Crime Lab (with a few years hiatus) from 1971
13  to 2005, testified about analyses he had done in 2001 and 2004 - in four separate cases
14  (Volume 37, April 7, 2009). He too had no specific recollection of his testing in this case,
15  but he had reported weights and had done lab work to identify suspected cocaine by doing
16  a color test and some crystalline tests. He then filled out a form. While he acknowledged
17  that one of the options with drug analysis was instrumental work, he noted that there had
18  been no GCMS machine available in the lab until the 1990's when it began moving
19  towards accreditation. There were discussions about giving instrumental analysis of drugs
20  a greater role. (RT 7423-24). However, none of his analyses involved instrumental
21  analysis (in this case), and there were no photographic records of them.

22      The technical review of his work was simply the review of the filling out of the
23  forms (RT 7427-28).

24      The balances were calibrated by an outside service and in the lab. He recalled that
25  the balances were calibrated 'routinely' but he had no recollection of calibration records.

26  _____

27      [3] Mr. Woo's testimony on this point is undermined by the March, 2010 external audit of
the Narcotics Unit which noted the lack of calibration and maintenance records - as did analyst
28  Lois Woodworth.

1   RT 7428.

2       Motions to exclude the testimony of all these analysts were brought prior to their

3   testimony; objections were made just before they testified; their testimony was made

4   subject to defense objections; it was received subject to a motion to strike; and the

5   defense's motions to strike were denied.

6   **III.   ARGUMENT AND AUTHORITIES IN SUPPORT OF THE GRANTING OF**
        **A NEW TRIAL ON COUNTS DEPENDENT ON THE COMBINATION OF**
7       **DRUG IDENTIFICATION AND WEIGHT TESTIMONY**

8       **There was a wealth of material not made available to the defense**

9       •   The SFPD had records indicating that analyst Debra Madden had been

10          arrested by the Belmont Police Department on October 2, 2007.  She

11          provided an explanation of what had occurred in the incident that led to her

12          arrest.  She testified that she was defending herself.  She was apparently not

13          credible in her testimony and she was found guilty on February 20, 2008 of

14          two misdemeanors.  She was placed on probation on May 9, 2008.  It was

15          later demonstrated that she had violated the terms and conditions of her

16          probation by violating the law, and failing to surrender a firearm.

17      •   The SFPD has a General Order, Order 2.01, which defines officer

18          misconduct.  It also has a manual of "Disciplinary Penalty and Referral

19          Guidelines".  Prior to her testimony in 2009, Ms. Madden had apparently

20          been the subject of a hearing finding her in violation of Department policy,

21          and indicating that she was chargeable with conduct unbecoming a member

22          of the Department.  (DP 2053 - 2077).

23      •   In early 2009, it appears that the City and County of San Francisco, through

24          the Police Department, had adjudicated the departmental discipline, and Ms.

25          Madden was ordered suspended, and was to complete a program that

26          involved alcohol rehabilitation (DP 2057-58).

27      •   The SFPD generated paperwork evidencing internal audits of the Narcotics

28          Unit.  These audits apparently existed for most of the years pertinent to this

1   case - though the post-conviction discovery made available pursuant to the

2   protective Order contains only a few years' worth of audit reports.

3   Nonetheless, the 2006 internal quality assurance audit report indicates that

4   certain reagents used in drug testing had themselves not been tested;

5   "weights used for calibration checks are not traceable"; one of the two gas

6   chromatographs was described as having degraded sensitivity; due to a

7   *Daubert* hearing [the above-described *Diaz* hearing] "some modifications in

8   the case record are under discussion", including the need to provide

9   additional data concerning the reagents and standards used to produce the

10   photographs that are used as standards by the laboratory to demonstrate what

11   a certain type of drug looks like during microcrystalline testing (DP 2646).

12   •   A 2007 internal audit indicates that two reagents have no performance check

13   documentation; weights used for calibration checks are not traceable, and

14   there is a suggestion of a need to purchase traceable weights; new

15   instruments will need log books - as the laboratory was not maintaining log

16   books (DP 2726 - 2727).

17   •   A 2008 internal audit of the Narcotics Unit also found that weights used for

18   calibration checks are not traceable - and that new instruments will need

19   maintenance log books.  (DP 2771).

20   •   November of 2009, the American Society of Crime Lab Directors audit

21   indicates there is insufficient documentation generated by the Crime Lab to

22   allow review of analysts' work, and also notes issues with equipment

23   maintenance records.

24   •   On February 26, 2010, Debbie Madden is interviewed by two SFPD Police

25   Inspectors.  As quoted below, she tells them of weight discrepancies in drug

26   samples being a common occurrence when re-analysis occurs.  She

27   mentioned one analyst who testified in this case, Frances Woo, as being

28   'really sloppy'.  She encouraged the officers to check her statements about

1    weight discrepancies with other analysts.  She also admitted taking some

2    cocaine for personal use, beginning either in the summer or fall of 2009.

3    •    In March, 2010, an audit conducted by a representative from the California

4    Department of Justice (Laboratory Directory John Yoshida) and by the

5    Director of the Sacramento District Attorney's Laboratory of Forensic

6    Sciences, discloses that there are no organized maintenance or repair

7    documentation materials from microscopes or balances.

8    **The Ninth Circuit test favors a new trial in this case**

9    The Ninth Circuit has set forth a five-element test to address newly discovered

10   evidence that is said to be the basis for a new trial.  The evidence must be newly

11   discovered.  1.  It must have been unknown at the time of trial.  2.  It must be material, not

12   merely cumulative or impeaching.  3.  Its existence must be viewed as raising the

13   probability that had it been known, or available, its use would have produced an acquittal.

14   Finally, the accused must not have failed to learn of it sooner.  *See*, generally, *U.S. v.*

15   *Walgren*, 885 F.2d 1417, 1428 (9th Cir., 1989).

16   *Walgren* was a case in which a District Court was alleged to have mistakenly

17   applied the procedural rules related to an alleged act of misconduct by the Government in

18   failing to provide certain information, which was alleged to have been a valid basis for a

19   new trial.  Part of the basis on which both the trial Court, and Court of Appeals, noted that

20   the Motion for New Trial could be denied was if the evidence at issue would not refute an

21   essential element of the Government's case.  *Id.* at 1428.

22   Normally, discovery of new impeaching evidence that relates solely to a witness'

23   believability, in itself, is insufficient to grant a new trial.  *U.S. v. Kulczyk*, 931 F.2d 542,

24   549 (9th Cir., 1991).  Thus, evidence of analyst Debbie Madden's prior conviction, alone,

25   might not be sufficient to warrant a new trial.  However, the Ninth Circuit has been willing

26   to 'assume' is that there may be newly discovered impeachment that "...is so powerful that

27   a jury would find [a witness's] testimony totally incredible."  *U.S. v. Davis, et al.*, 960

28   F.2d 820, 824-825 (9th Cir., 1992).  The *Davis* Court reviewed the conviction before it on

1   the assumption, reflected in the ruling, that there may be situations in which impeachment

2   would remove reliance on a given witness' testimony–though in that case, the Court's

3   analysis was that even if one assumed that the witness at issue would have been

4   "completely destroyed," there was other evidence to support the convictions. *Id.* at 827-

5   828. Thus, the post-conviction revelation that the SFPD Drug Lab had detected evidence

6   shortages, and other signs that Ms. Madden may have been taking cocaine evidence over a

7   period of time - and then gave an incomplete account of her purloining of drug evidence is

8   significant under this test. Ms. Madden was an analyst who was apparently abusing

9   alcohol and cocaine in 2009, who initially attempted to explain evidence shortages in part

10  by referencing the notorious changes in drug weights when samples were re-weighed.

11      This evidence is material in several ways. First, it reflects on Ms. Madden's

12  credibility personally. Second, it opened the testimony about the reliability of lab practices

13  open to question as Ms. Madden indicated to police officers who interviewed her in

14  February, 2010 that: she didn't 'scoop out' significant amounts of lab evidence for

15  personal use. She otherwise stated that: "... I've seen tons of times when we re-analysis

16  someone else's dope, the weights have been way off." (PD 020). The analysts "... hated

17  doing [re-analysis] because a lot of times [the weight] would be way off." (PD 021)

18  Elsewhere, Ms. Madden explained "... I think you'll see discrepancy in a lot of different

19  cases... I have when I re-analyzed it." PD 25:15-18. Later in the interview Ms. Madden

20  explained again that she had seen discrepancies in drug weights and that if the police went

21  back to check weights historically "... you will find discrepancies... Just from weighing I

22  have." Ms. Madden added "... the weighing, weighing errors we used to find a lot in um,

23  Frances Woo's cases." (PD 32-33).[4]

24      The testimony presented at trial told the jurors that analysts were aware that

25  balances are subject to calibration. The impression left was that calibration happened; it

26

27

---

28      [4] All of these references are to disclosures provided to counsel which have also been reported and published.

1  could have been a regular procedure; it could have happened from time to time. However,

2  as analyst Madden told SFPD officers in February, 2010, lab analysts were aware that

3  there would usually be a discrepancy if you re-weighed suspected cocaine that had been

4  weighed before. And for years, there were no regular records kept of the calibration

5  processes–and up until 2008 or 2009, the Lab could not account for its internal 'control'

6  weights–which would have been used for internal calibration. Moreover, the internal audit

7  reports, and the March, 2010 audit report established that there were no maintenance or

8  calibration logs kept for balances on a regular basis, which was a quality control problem.

9          The internal audit reports pertinent to this subject were in existence at the time of

10  trial. So were the audit reports indicating that in the future, log books would need to be

11  kept–and that control weights needed to be acquired and retained for at least some of the

12  balances. The defense had none of these reports in hand.[5]  In addition, the Lab's quality

13  control paperwork from 2006 established that as a result of a '*Daubert*' hearing, it was

14  evident that more attention would need to be paid to link the photos of micro-crystals used

15  as standards to work done with the Lab's procedures. That matter was necessitated by an

16  analyst's confusion, during the *Diaz* hearing, about whether a photo produced by attorney

17  Michael Burt was of a micro-crystal test or not. The defense was not given a copy of that

18  report (which references just the *Daubert* hearing and the standard photos, not the entire

19  explanation just given).

20          Finally, the external audit reports produced by ASCLD in November, 2009, and by

21  the invited external auditors in March, 2010, both confirmed points that the defense had

22  been trying to make. First, the documentation produced by the Lab in drug analysis cases

23

24

25          [5] Nor was the defense given the quality assurance reports that would have allowed cross-examination of Frances Woo who showed a command of drug chemistry while offering

26  testimony before the jury, but who was personally mentioned in the quality assurance reports as not ensuring that certain quality control procedures were taken, even while he was a Narcotics

27  Section supervisor.  He was also, as explained above, specifically mentioned by Ms. Madden as an analyst who was "really sloppy", which she explained as the basis for finding weight

28  discrepancies in his work.  (DP at 33).

1   was insufficient to allow independent review–a problem that ASCLD submitted to the Lab

2   to resolve. Second, the March, 2010 audit confirmed that even then, the balance and

3   instrumental log books were missing.

4         In sum, the newly discovered evidence establishes that any testimony about drug

5   weight was unreliable–and that drug identification testimony should have been tempered

6   with the concerns expressed by the internal auditors in the aftermath of the 2006 internal

7   audit.  The evidence at issue came in three main forms.  First, there were historical records

8   kept by the SFPD Crime Lab that were responsive to defense discovery requests, and that

9   the defense never obtained: quality assurance documents; internal audits; internal reports.

10        Second, there were Debbie Madden related documents that bore on her credibility -

11  personnel records that included SFPD disciplinary allegations and findings, and the

12  records of her 2007 case and convictions.  In addition, there was newly discovered

13  evidence that Ms. Madden may have been taking and using SFPD evidence cocaine in

14  2009, though under questioning her estimates seemed to put her use in the fall, 2009.  She

15  did not deny using in the summer of the year (when she was testifying).

16        Third, there was a combination of information made available after the convictions

17  that demonstrated that there were indeed significant quality control issues with the SFPD

18  Crime Lab's drug analysis unit that would have reflected on the reliability of the testimony

19  in this case: the 2009 ASCLD audit and site visit report, the March 2010 external audit

20  requested by the Police Chief; the 2010 Debbie Madden interview that contained a series

21  of statements about her knowledge of drug weights consistently being "off" when re-

22  analyzed.

23        **A *Brady* violation occurred in this case**

24        The Government must disclose material exculpatory evidence where the accused

25  makes either a specific or general request for the material.  *Brady v. Maryland*, 373 U.S.

26  83, 87 (1963).  Indeed, such information must be supplied even when no requests are

27  made.  *U.S. v. Agurs*, 427 U.S. 97, 107 (1976).

28        While the Government has informed the Court that it depended on the SFPD to

respond to its inquiries, counsel for the Government have never made clear whether they ever reviewed SFPD laboratory records to assess whether there was any disclosable information in them that was not being offered as discovery.  The U.S. Supreme Court has pointed out that "... whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.  The prosecutor's office is an entity and as such it is the spokesman for the Government." *Giglio v. U.S.*, 405 U.S. 150, 154 (1972).

Prosecutors have a "... duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  While courts have drawn a distinction between police agencies and prosecution offices for some purposes, several cases note that "the individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." *U.S. v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995); *Smith v. Secretary Department of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995).

Here, there is evidence, subject to judicial notice, and referenced in the record of this case, that there was a memorandum of understanding between federal agencies and the SFPD related to joint investigations.  The relationship between the SFPD and the U.S. Attorney is the kind of "... close working relationship" between a police agency and the U.S. Attorney that makes it difficult for the U.S. Attorney to claim that he or she has no discovery obligations because of the compartmentalization of the investigation.  See, generally, *U.S. v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992).

The defense has previously pointed out the existence of the Seventh Circuit's opinion in *United States ex rel Smith v. Fairman*, 769 F.2d 386 (7th Cir. 1985).  There, unbeknownst to a prosecutor, an investigator had recorded on a firearms worksheet that a charged defendant's firearm was inoperable - in a case in which the accused was alleged to have shot at two police officers and committed a robbery.  The firearms report that showed the firearm was inoperable was in the investigator's file, but never given to the prosecutor. The prosecutor was held responsible, notwithstanding the Court's view that he was "blameless" for the failure to disclose.  *Id.* at 391-392.

1    The Government has never made clear to this Court exactly how it went about

2  trying to get material responsive to the defense's multiple discovery requests.  It does not

3  even shed light on whether it delegated to an intermediate, like a police officer, the duty to

4  see that all discoverable material was made available.  See, for example, *U.S. v. Alvarez*,

5  86 F.3d 901, 905 (9th Cir. 1996) where the practice of delegating to a non-attorney police

6  officer the responsibility to determine if law enforcement rough notes contained *Brady*

7  material was deemed "problematic".

8    The issue presented is whether the information, if available, would have resulted in

9  a favorable outcome on the pertinent counts.  Clearly, if there were problems with

10  laboratory practices that undermined drug identification testimony, and deprived the

11  analysts of the ability to give accurate and reliable evidence about drug weights, the

12  evidence presented would be undermined.

13    **Newly discovered evidence would have produced an acquittal on counts that
      depended on drug weight and drug identification evidence.**

14

15    Several of the counts in this case were specifically rooted in evidence concerning

16  drugs, including Count 1 (the conspiracy to distribute and possess with intent to distribute

17  50 grams or more of cocaine base); Count 2 (insofar as it charged the same drug-related

18  elements as Count 1); Counts 11 and 12, which are dependent on proof that Mr. Cyrus

19  possessed drugs weighing a certain amount on August 31, 2002.

20    The defense recognizes that there is a distinction between a charge that is totally

21  dependent on proof that an individual (or group of individuals) possessed a certain type of

22  drug in a given quantity, and a conspiracy which has multiple objectives - like Count 2.

23  However, this case was tried around the theory that the so-called "Page Street Mob" was a

24  group of persons involved in drug usage and distribution - and this was the main money-

25  generating characteristic of the "Mob" as a racketeering organization.

26    Arguably, the evidence discussed above pertained to any crime rooted in the

27  racketeering law whether it was Count 2, the conspiracy, or all of the violent crimes in aid

28  of racketeering - including Counts 3-8, all of which were predicated in part on the jury's

finding the existence of an enterprise as defined in Count 2. This definition, of necessity, included the case-specific characteristic that the alleged enterprise was involved in the distribution of cocaine in a given quantity or more - though the defense acknowledges that this is not the only defining characteristic of the enterprise.

Counts 11 and 12 specifically related to the allegation that Mr. Cyrus possessed cocaine on August 31, 2002, and that the cocaine at issue weighed 5.88 grams. Count 11 was predicated on a possession within a certain distance from a school or playground, Count 12 was the possession with intent to distribute cocaine base, though the possession was charged as indicated.

**The impact of the newly discovered and undisclosed evidence in this case is assessed under two related tests.**

Exculpatory evidence that is not disclosed to the defense is material only if there is a reasonable probability that had the evidence been disclosed to the defense the result would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *U.S. v. Bagley*, 473 U.S. 667 at 682 (1985). The *Bagley* test, however, was further refined by the Court's decision in *Kyles v. Whitley, supra*, 514 U.S. 419 where the Court noted that the question is not whether the accused would have received a different verdict, but rather "... whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. Where there are several different items of evidence that were not disclosed, the cumulative effect of non-disclosure may result in a verdict unworthy of confidence. *U.S. v. Pelullo*, 105 F.3d 117, 122 (3d Cir. 1997).

The Ninth Circuit's test for the assessment of the impact of newly discovered evidence is somewhat similar. The question to be addressed is whether had the evidence been known, or available, its use would have produced a different result - which in the formulation used by the Ninth Circuit in *U.S. v. Walgren, supra*, 885 F.2d at 1428 means that its use would have produced an acquittal. The evidence must be seen to refute an essential element of the Government's case. *Id.*

1   Clearly, had the defense had in hand both the disclosures that were not produced

2   (relating to the lab's quality assurance; the history of internal knowledge of failure to

3   maintain documentation pertinent to the functioning and maintenance of instruments; the

4   knowledge of the problems pointed out in the aftermath of the *Diaz* hearing), combined

5   with the post-conviction evidence that clearly underscored that the lab failed to produce

6   documentation that would permit review, failed to possess (or maintain) log books that

7   would permit review of calibration and instrument maintenance, combined with the still-

8   unrefuted Madden allegations that it was commonly known among lab analysts that drug

9   weights were often 'off' and that discrepancies in drug weights were routinely discovered

10  (in addition to her statements concerning analyst Woo) would have combined to produce a

11  different result.

12      **The issue of drug weight and identification is critical in federal court because
        it has sentencing ramifications.**

13

14      In federal court, all participants have known for some time that the Sixth

15  Amendment jury trial right applies to any fact that increases the maximum penalty to

16  which a defendant is exposed.  Drug weight (and indeed drug identification) are factors of

17  sentencing significance under the line of cases that began with *Apprendi v. New Jersey*,

18  530 U.S. 466 (2000), and reached death penalty jurisprudence in *Ring v. Arizona*, 536 U.S.

19  584 (2002).  The discussion of these issues continued in several other cases including

20  *Blakely v. Washington*, 542 U.S. 296 (2004).

21                          <u>**CONCLUSION**</u>

22      For the reasons stated in this motion, this Court should grant Dennis Cyrus, Jr. a

23  new trial on charges dependent on the sufficiency, and reliability, of evidence concerning

24  drug identification and drug weight, including Counts 1 and 2, and 11 and 12 of the

25  redacted Superseding Indictment - and the Court should also consider that the evidence at

26  //

27  //

28  //

1   issue infects the validity of the VICAR convictions for the reasons demonstrated above.

2   Dated: October 8th ,  2010

3                                          Respectfully submitted,

4                                          JAMES S. THOMSON
                                           JOHN T. PHILIPSBORN
5

6
                                           By  /s/ John T. Philipsborn
7                                              Attorneys for Defendant
                                               DENNIS CYRUS, JR.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **PROOF OF SERVICE**

2          I, Steven Gray, declare:
            That I am over the age of 18, employed in the County of San Francisco, California,
3    and not a party to the within action; my business address is Suite 350, 507 Polk Street, San
     Francisco, California 94102.
4          On today's date, I served the within document entitled:

5    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
     MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED**
6    **EVIDENCE (FRCP 33)**

7
     ( )    By placing a true copy thereof enclosed in a sealed envelope with postage thereon
8           fully prepaid, in the United States Mail at San Francisco, CA, addressed as set forth
            below;
9    (X )   By electronically transmitting a true copy thereof;
     ( )    By having a messenger personally deliver a true copy thereof to the person and/or
10          office of the person at the address set forth below.

11   Robert Rees
     William Frentzen
12   Assistant United States Attorneys
     Office of the United States Attorney
13   450 Golden Gate Avenue, 11th Floor
     San Francisco, CA 94102

14

15

16         I declare under penalty of perjury under the laws of the State of California that the
     foregoing is true and correct.
17
           Executed this 8th  day of October, 2010, at San Francisco, California.
18
                              Signed:        /s/ Steven Gray
19                                           Steven Gray

20

21

22

23

24

25

26

27

28