BRIAN J. STRETCH (CSBN 163973)
Acting United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Acting Chief, Criminal Division

WILLIAM FRENTZEN (LASBN 24421)
ROBERT DAVID REES (CASBN 229441)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, CA 94102
   Telephone: (415) 436-7210
   Facsimile: (415) 436-7234
   Email: robert.rees@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DENNIS CYRUS, JR.,<br><br>    Defendant. | No. CR 05 0324 MMC<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Hearing: November 19, 2010<br>Time: 1:30PM<br>Court: Hon. Maxine M. Chesney |

## I. INTRODUCTION

On May 11, 2009, after trial by jury, the defendant was convicted of all sixteen counts of the captioned redacted indictment: one violation of 21 U.S.C. § 846, conspiracy to distribute narcotics; one violation of 18 U.S.C. § 1962(d), conspiracy to commit a RICO crime; one violation of § 1959(a)(5), attempted VICAR murder; one violation of § 1959(a)(3), VICAR assault with a dangerous weapon; three violations of § 1959(a)(1), VICAR murder; one violation of § 1959(a)(1), VICAR kidnaping; one violation of § 1512(a)(1)(A) and (C), witness murder; one violation of § 1513(a)(1)(A) and (B), witness retaliation; one violation of 21 U.S.C. § 841, possession with intent to distribute crack cocaine; one violation of 21 U.S.C. § 860(a), possession with intent to distribute crack

cocaine near a playground or housing facility; and four violations of 18 U.S.C. § 924(c), discharging a firearm during a crime of violence. Sentencing has been set for November 19, 2010. On June 26, 2009, the jury determined that the defendant's sentence for each VICAR murder shall be life without the possibility of release.

The United States submits that the defendant's Offense Level is 43 and his Criminal History is IV, yielding an applicable Guidelines-advised sentence of life imprisonment plus consecutive sentences for each § 924(c) count. Taking into consideration that recommendation plus § 3553(a)'s sentencing factors as set forth more fully at trial and below, the United States respectfully requests that the Court sentence the defendant to three consecutive terms of life imprisonment without the possibility of release for each VICAR murder, to be followed by a consecutive term of 20 years for the VICAR assault with a dangerous weapon on Marcus Atkinson, to be followed by a consecutive term of a total of life for all remaining non-§ 924(c) counts, to run concurrently with each other, to be followed by four consecutive terms of life imprisonment for each § 924(c) count. This results in an overall sentence of eight consecutive life sentences, three of which are without possibility of release, followed by a consecutive 20 year sentence.

## II. STATEMENT OF FACTS

The Court and the parties are well aware of the facts and circumstances of this case, so no lengthy statement of facts appears necessary. At trial, the United States proved that the defendant committed sixteen federal crimes centered around his membership in the Page Street Mob, a violent street gang operating in the Western Addition of San Francisco. As part of his activities with Page Street Mob, the defendant attempted to murder Marcus Atkinson by shooting him four times about the chest, tortured, kidnaped, and murdered Joseph Hearns, shot Randy Mitchell numerous times at point blank range, killing him, and executed Ray Jimmerson, Jr., because he was a cooperating federal witness. The United States also proved that Cyrus personally

possessed crack cocaine with the intent to distribute it near a playground and that he conspired with other Page Street Mob members to distribute crack cocaine. The jury convicted on all counts and delivered a sentence of life without the possibility of release for Counts Five, Seven, and Eight, each of which are VICAR counts related to Cyrus's three murders.

## III. OVERVIEW OF SENTENCING GUIDELINES CALCULATIONS

The United States submits that the Offense Level applicable to Cyrus should be calculated as follows:

| | | |
|---|---|---|
| Base Offense Level: | 51 | U.S.S.G. § 2E1.1(a)(2) (more fully discussed below) |
| Group Adjustment | +3 | U.S.S.G. § 3D1.4 |
| **Total** | **43**[1] | |

## IV. DISCUSSION OF GUIDELINES CALCULATIONS

The Guidelines calculation in a multi-count RICO case such as this one can be complicated. Perhaps as a result, the PSR has significantly miscalculated the guidelines in this case. While the United States agrees with Probation's ultimate calculation of Cyrus's offense level of 43, it is important that the guidelines be properly calculated so that the Court may take them into consideration. Accordingly, the full and proper calculation of the guidelines follows, organized by the proper grouping of offenses under § 3D1.4.

**Group One: Narcotics Conspiracy, Offenses, and Murder of Randy Mitchell in Furtherance Thereof (Counts 1, 7, 11, & 12):**

**Offense Level 45**

---

[1] According to Application Note 2 to the Sentencing Table in Chapter 5, Part A, "An offense level of more than 43 is to be treated as an offense level of 43."

The United States agrees with U.S. Probation that all three of the defendant's drug related convictions are grouped along with the murder of Randy Mitchell, which was alleged as an overt act of the drug conspiracy, and that the resulting base offense level is 43 due to § 2D1.1(d)(1)'s cross reference to the first-degree murder guidelines in § 2A1.1(a). Additionally, the United States submits that the defendant should receive a 2-level upward adjustment for obstruction of justice because it was established at trial that Cyrus contacted witness Delwan Blazer and asked him to lie about his knowledge of the Randy Mitchell murder while both were in custody. Accordingly, we would submit the following Guidelines calculation for Group One:

Base offense level (as cross-referenced) (§ 2A1.1(a)):   43
Obstruction of Justice (§ 3C1.1):                       +2
TOTAL:                                                   45

**Group Two: RICO Conspiracy (Count 2):**
**Offense Level 51**

Unfortunately, U.S. Probation has badly miscalculated the RICO conspiracy guidelines, splitting up Count Two into numerous different groups. This is plainly improper under § 3D1.1–1.4, which sets forth the procedure for determining the offense level for multiple counts of conviction. U.S. Probation's inclusion of Count Two, the RICO conspiracy count, in multiple different groups has no basis in precedent or the guidelines themselves, which clearly state that each count of conviction must be placed into a "distinct" group. § 3D1.1(a)(1). Count Two must be placed into a single, distinct group, and because it encompasses numerous instances of criminal activity no single one of which "involves substantially the same harm" as the overall RICO conspiracy, it must be a group unto itself. § 3D1.2.

The offense level for RICO conspiracy is determined under § 2E1.1(a)(2), and it requires a calculation of each of the offense levels for all the underlying racketeering act offenses. The offense levels for each underlying offense are then grouped together

according to the grouping rules in Chapter Three, Part D, which then yields the final offense level for the RICO conspiracy count. In other words, instead of the overt acts being part of the larger grouping to determine the overall offense level for the entire case, § 2E1.1(a)(2) requires a calculation of each overt act within the RICO guideline to determine its overall base offense level.

Confusingly, U.S. Probation claims that the grouping rules can only be applied once, and thus cannot be "internally" applied within the RICO count's guidelines determination. This ignores the plain language of Application Note 1 to § 2E1.1. Application Note 1 states that "[w]here there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction" and then "apply Chapter Three, Parts A, B, C, and D" to determine the overall offense level for the RICO count. Because Chapter Three, Part C contains the grouping rules, it is clear that an internal calculation of the RICO predicates, including grouping rules, must be utilized to determine the overall offense level for Count Two's RICO conspiracy conviction.

It is appropriate to include all specifically alleged racketeering acts contained in Count Two of the indictment occurring since Cyrus joined Page Street Mob as an adult, including those he did not personally commit, because relevant conduct includes all acts by co-conspirators that are reasonably foreseeable to the defendant. § 1B1.3(a). The two post-arrest events for which Cyrus is criminally responsible are the attempted murders of Pedro Raigoza and Randy Minor and the conspiracy to murder Travis Trammell. Cyrus himself committed the most serious violent acts alleged against Page Street Mob and personally dealt drugs; accordingly, it was reasonably foreseeable that other members would commit violent acts and deal drugs as well, even after he was jailed.[2] The

---

[2] U.S. Probation refused to include the two post-arrest acts because it did not believe there was any evidence Cyrus actually knew they would occur. Of course, that misunderstands the law, which *presumes* lack of knowledge in the vicarious liability context. *See, e.g., United States v. Hoskins*, 282 F.3d 772, 776 (9th Cir. 2002) (explaining that, to demonstrate vicarious liability, that the government "is not required to establish that [a defendant] had actual knowledge of the [crime]. The touchstone is foreseeability").

UNITED STATES' SENTENCING MEMORANDUM
CR 05 0324 MMC                          5

defendant never withdrew from the conspiracy (he was still writing "PST" on his jailhouse wall well after arrest), and knew that his fellow Page Street Mob members were still on the street. Accordingly, the United States submits that the Guidelines calculation for Group Two, which consists solely of Count Two, are as follows:

*Rack Act 8: Attempted Murder of Marcus Atkinson*

| | |
|---|---|
| Base offense level (§ 2A2.1(a)(1)): | 33 |
| Life threatening bodily injury (§ 2A2.1(b)(1)(A)): | +4 |
| Restraint of Victim (§ 3A1.3): | +2 |
| TOTAL: | 39 |

*Rack Act 9: Murder of Joseph Hearns*

| | |
|---|---|
| Base offense level (§ 2A1.1(a)): | 43 |
| Restraint of Victim (§ 3A1.3): | +2 |
| Obstruction of Justice (§ 3C1.1): | +2 |
| TOTAL: | 47 |

GROUPED:

*Rack Act 10: Possession with Intent to Distribute 31.04g crack*
*Rack Act 11: Murder of Randy Mitchell*
*Rack Act 12: Possession with Intent to Distribute 5.88g crack*

| | |
|---|---|
| Base offense level (§ 2A1.1(a)): | 43 |
| Obstruction of Justice (§ 3C1.1): | +2 |
| TOTAL: | 45 |

*Rack Act 13: Murder of Ray Jimmerson*

| | |
|---|---|
| Base offense level (§ 2A1.1(a)): | 43 |
| Obstruction of Justice (§ 3C1.1): | +2 |
| TOTAL: | 45 |

*Rack Act 14: Attempted Murders of Randy Minor and Pedro Raigoza*

| | |
|---|---|
| Base offense level (§ 2A2.1(a)(1)): | 33 |
| Life threatening bodily injury (§ 2A2.1(b)(1)(A)): | +4 |
| TOTAL: | 37 |

*Rack Act 15: Conspiracy to Murder Travis Trammell*

| | |
|---|---|
| Base offense level (§ 2A1.5(a)): | 33 |
| TOTAL: | 33 |

On to the grouping calculations of Chapter 3, Part C as required by § 2E1.1 Application Note 1 (§ 3D1.4):

Highest Offense Level = Rack Act 9 = 47 = 1 Unit

Groups within 4 levels = Rack Acts 10/11/12 & Rack Act 13 = 2 Units

Groups within 5-8 levels = Rack Act 8 = 1/2 Unit

Disregard remaining rack acts because 9 or more levels away

TOTAL: 3 1/2 Units

Now for the Overall Offense Level for Group Two (Count 2), the RICO conspiracy under § 2E1.1(a)(2):

| | |
|---|---|
| Lead offense (Rack Act 9): | 47 |
| Unit Adjustment for additional Rack Acts (§ 3D1.4): | +4 |
| TOTAL OFFENSE LEVEL: | 51[3] |

**Group Three: Attempted Murder of Marcus Atkinson (Counts 3 & 4):**
<u>**Offense Level 39**</u>

---

[3] An offense level of 51 is obviously much higher than 19, the "default" offense level for RICO cases under § 2E1.1(a)(1), and Application Note 1 instructs to "[u]se whichever subsection results in the greater offense level."

The United States agrees with how U.S. Probation has calculated the offense level relating to the attempted murder of Marcus Atkinson (Probation's Group Four, PSR ¶ 99–105), and agrees that it should be calculated as follows:[4]

| | |
|---|---|
| Base offense level (§ 2A2.1(a)(1)): | 33 |
| Life threatening bodily injury (§ 2A2.1(b)(1)(A)): | +4 |
| Restraint of Victim (§ 3A1.3): | +2 |
| TOTAL: | 39 |

**Group Four:  Murder of Joseph Hearns (Counts 5 & 6):**
**<u>Offense Level 47</u>**

The jury found beyond a reasonable doubt that Cyrus murdered Joseph Hearns and that he kidnapped him during the course of the murder.  Additionally, it was established at trial that Cyrus took steps to ensure that the murder weapon, a Desert Eagle, was disposed of by witness Genece Hopkins after receiving it from Patrick Koller, who got it from Cyrus with instructions to get rid of it.  This merits an obstruction of justice enhancement. *See* § 3C1.1 Application Note 4(D) (stating that an obstruction of justice enhancement applies when a defendant destroys, conceals, or directs or procures another person to destroy or conceal, material evidence of a crime).  Accordingly, this group should be calculated as follows:

| | |
|---|---|
| Base offense level (§ 2A1.1(a)): | 43 |
| Restraint of Victim (§ 3A1.3): | +2 |
| Obstruction of Justice (§ 3C1.1): | +2 |
| TOTAL: | 47 |

---

[4] As a point of correction, the PSR states that the defendant restrained the victim during the course of the attempted murder, but it was actually co-conspirator Lacy Jackson who restrained Mr. Atkinson when Mr. Jackson and Cyrus confronted the victim.

**Group Five: Murder of Ray Jimmerson (Counts 8, 9, & 10):**

**Offense Level 45**

The jury found beyond a reasonable doubt that Cyrus murdered Ray Jimmerson, Jr., in three separate counts. Additionally, and as noted above, it was established at trial that Cyrus took steps to ensure that the murder weapon, a Desert Eagle, was disposed of by witness Genece Hopkins, meriting an obstruction of justice enhancement. *See* § 3C1.1 Application Note 4(D). Accordingly, the United States submits that this group should be calculated as follows:

| | |
|---|---|
| Base offense level (§ 2A1.1(a)): | 43 |
| Obstruction of Justice (§ 3C1.1): | +2 |
| TOTAL: | 45 |

**The § 924(c) Weapons Counts (Counts 13, 14, 15, & 16):**

The guidelines do not assign offense levels to § 924(c) charges, so they are not considered for purposes of the grouping rules; instead, they are added after a guidelines-recommended sentence is determined. § 2K2.4(b). The United States agrees with U.S. Probation that the mandatory minimum sentence for Count 13, the weapons count related to the attempted murder of Marcus Atkinson, provides for a mandatory consecutive minimum sentence of 10 years due to the discharge of a firearm, and the remaining counts each require a mandatory consecutive minimum of 25 years by law. *See* § 924(c)(1)(D)(2). However, the statutory maximum term of imprisonment for all four § 924(c) counts is life, s*ee Harris v. United States*, 536 U.S. 545 (2002), and the United States further agrees with U.S. Probation that a life term is merited on each of those counts. *See* PSR Recommendation.

**The Final Offense Level:**

**Offense Level 43**

The only tasks remaining are to determine the overall offense level after applying

the grouping rules, and then to determine whether the defendant is entitled to a downward adjustment for acceptance of responsibility. First, the grouping calculations:

>    Highest Offense Level = Group Two = 51 = 1 Unit
>    Groups within 4 levels = Group Four = 1 Unit
>    Groups within 5-8 levels = Group One and Group Five = 1 Unit
>    Disregard Group Three because 9 or more levels away
>    TOTAL:                                         3 Units

This results in a Final Overall Offense Level applicable to Cyrus as follows:

>    Lead offense (Group One):                          51
>    Unit Adjustment for additional Groups (§ 3D1.4):   +3
>    TOTAL FINAL OFFENSE LEVEL:                         54

The defendant claims that he is entitled to a downward adjustment for acceptance of responsibility because he indicated a willingness to entertain plea negotiations with the government on a number of occasions. It is both irrelevant and improper for the defendant to refer to or submit failed plea negotiations between the parties to this Court. First, such failed plea negotiations do not even arguably relate to any of § 3553(a)'s factors nor any of the reasons set forth in the Guidelines related to acceptance of responsibility. Moreover, the defendant is essentially inviting this Court to commit a potential Rule 11 violation and pass judgment on the reasonableness of the parties' negotiating positions leading up to and into trial. The defendant had every right to plead guilty to any or all of his counts of convictions to the Court without any agreement by the prosecution. The prosecution would have been powerless to prevent him from doing so, but he never did. The fact that he would only plead guilty so long as he had extracted some kind of concession from the government does not in any way demonstrate acceptance of responsibility.

Even if it were proper to present the details of failed plea negotiations to this Court

for consideration, this circumstances of his plea offer in this case are not mitigating. Cyrus did offer to plead guilty to a life sentence—so long as the government agreed not to seek a death sentence—but he did so only *after* the jury had been selected and sworn, only *after* opening statements had begun, and only *after* he had been provided with the names of all the witnesses against him. A guilty plea in such circumstances does not demonstrate any acceptance of responsibility; rather, it merely demonstrates that Cyrus finally realized the gravity of his situation and the evidence against him, well past the 11th hour.

      U.S. Probation has apparently agreed to award the defendant 2 points for acceptance of responsibility in reliance on § 3E1.1 Application Note 2, which says that defendants who go to trial can merit the adjustment in rare circumstances where a trial was conducted simply to preserve the right to contest some legal issue as in, for example, a stipulated facts bench trial. Those circumstances are not even arguably present here. The Court presided over the several-month guilt phase of the trial where the defendant vigorously cross-examined nearly every witness and asked for a finding of not guilty on all counts during closing statements.

      Looking at all the facts and circumstances of this case, it is abundantly clear that Cyrus has accepted absolutely no responsibility for his actions. The factors to consider under U.S.S.G. § 3E1.1 Application Note 1 include: "Truthfully admitting the conduct comprising the offense of conviction ... ." Cyrus has never done this, not even now, after conviction, during the course of the preparation of the PSR where he declined even to speak with U.S. Probation. PSR ¶ 72. "Voluntary termination or withdrawal from criminal conduct or associations." Cyrus did not do this, rather he fled California and continued to revel in his exploits by writing raps about his murders and writing the name of his gang on his jail cell walls. "Voluntary payment of restitution prior to adjudication of guilt." Cyrus has never done this. "Voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense." Cyrus never assisted in the collection of his murder weapons or in anything else; instead, he took steps to destroy evidence and

suborn perjury. "Voluntary resignation from the office or position held during the commission of the offense." Cyrus did not do this. "Post-offense rehabilitative efforts." Cyrus certainly has not rehabilitated to the point of acceptance of responsibility or made any efforts to do so. Instead, his interactions with psychologists have not been to seek treatment but have been to fight his crimes. "The timeliness of the defendant's conduct in manifesting the acceptance of responsibility." Even if the defendant's offer to plead guilty to a life sentence in exchange for concessions from the government could qualify, it only occurred after trial began, heavily undermining its sincerity due to its timing.

Finally, U.S.S.G. § 3E1.1, Application Note 4 also provides that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstruction or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§3C1.1 and 3E1.1 may apply." As set forth above, many of Cyrus's counts of conviction contain upward adjustments for obstruction of justice. And this case can hardly be called one of the extraordinary situations where obstruction and contrition occur simultaneously. After all, two of the counts of conviction involve Cyrus's murder of a federal witness expressly in order to obstruct justice. For all of these reasons, the defendant is not entitled to an adjustment for acceptance of responsibility.

It should be noted that, because the final offense level exceeds 43, it is treated as a 43 for purposes of determining a Guidelines recommended sentence from the sentencing table. *See* Application Note 2 to the Sentencing Table in Chapter 5, Part A ("An offense level of more than 43 is to be treated as an offense level of 43.").

## V. CRIMINAL HISTORY CATEGORY

All three of the defendant's juvenile sentences must be counted under § 4A1.2(d)(2), which allocates points for Cyrus's juvenile convictions occurring "within five years of his commencement of the instant offense." The defendant commenced the instant offenses no later than July 28, 2002, when he committed the attempted murder of

Marcus Atkinson in furtherance of his membership in Page Street Mob. Because all three of the defendant's juvenile sentences occurred within five years of that date, all three must be counted. The "joyriding" conviction in ¶ 113 scores as one point under § 4A1.2(d)(2)(B), while Cyrus's two juvenile felony convictions in ¶¶ 114 and 115 score as two points each under § 4A1.2(d)(2)(A) because Cyrus was sentenced to be confined for more than 60 days for each crime. Moreover, 2 points must be added under § 4A1.1(d) because Cyrus was still serving his term of juvenile probation when he committed the crimes in this case, as established at trial. Accordingly, his Criminal History Category is IV.

U.S. Probation claims that Cyrus has no criminal history. Since it is undisputed that Cyrus was indeed on juvenile probation when he committed the instant offenses, it is difficult to understand why U.S. Probation believes that he does not at least score 2 points under § 4A1.1(d). Certainly U.S. Probation has failed to articulate any reason.

U.S. Probation further claims that none of the defendant's juvenile sentences can be counted because Cyrus was merely deemed a "ward of the court" for each. That position is directly contrary to binding Ninth Circuit precedent. *See United States v. Sanders*, 41 F.3d 480, 486 (9th Cir. 1994) (noting that, under California law, "a child may be declared a ward of the court as a 'law violator' only after the government shows 'beyond a reasonable doubt' that the child has violated a criminal law" and holding that a "juvenile adjudication, in which the court declared [a defendant] a ward of the court, involve[s] an adjudication of guilt and may be used in calculating [a defendant's] criminal history").

U.S. Probation's position is even more astonishing given that it is factually contradictory to the PSR itself. The PSR describes Cyrus's joyriding conviction as "[a]djudicated" in ¶ 113, indicates that the defendant was "committed to Camp Sweeney" as a result of a probation violation for his felony auto theft conviction in ¶ 114, and that the defendant was again "[c]ommitted to Log Cabin Ranch School" as a result of his felony accessory conviction in ¶ 115. There is simply no evidence that he was ever even

deemed a ward of the court for his first and third juvenile convictions.  And even if the defendant were deemed a ward of the court on his second conviction when initially placed on probation, it is clear that the sentence occurred as a result of his violating the terms of probation, not that he was not sent to the camp as some sort of temporary housing situation.  The Court heard the facts and circumstances surrounding Cyrus's juvenile crimes during the sentencing phase; they were serious crimes and must be counted as such under the Guidelines.  U.S. Probation's position is legally meritless and directly contradicts the facts set forth in its own report.

## VI.  OTHER § 3553(a) FACTORS

The § 3553 factors in this case speak for themselves, and were essentially articulated during the government's closing and rebuttal statements in the penalty phase of the trial.  They will not be repeated in any detail here.  The bottom line is that Cyrus is a serial killer who brutally murdered three members of his community over three consecutive weekends shortly after attempting to murder a fourth.  His murders were especially heinous, involving torture, kidnaping, humiliation, execution, and close range fire.  He bragged about and celebrated his murders, reveling in some of their most gory details.  When confronted with any kind of evidence of guilt, he did nothing but exploit any angle he saw, destroying evidence, fleeing under an assumed name, suborning perjury, and falsely claiming he was too intoxicated to know what he was doing.

Even now, after representing to the court and the jury that the only possible sentences for his murders were death and life without the possibility of release, he seeks a sentence of life in order to maintain a possibility of release for himself.  The United States strongly stands by the jury's penalty phase factual findings.  The jury found every single statutory aggravating factor and all but one non-statutory aggravating factor unanimously and beyond a reasonable doubt in this case.  All of these, the jury believed, tended to suggest that the defendant should have been sentenced to death.  Despite the defense submitting dozens of mitigating factors, the jury unanimously found only a single factor

UNITED STATES' SENTENCING MEMORANDUM
CR 05 0324 MMC                       14

weighing against the death penalty, at the much lower evidentiary standard of "more likely than not." Whatever mitigation there may be in Cyrus's favor, it is overwhelmingly outweighed by the multitude and magnitude of the serious aggravating factors he presents.

The jury's verdict has ensured that Cyrus will spend the rest of his life in prison. To a certain extent, whether his sentences will run concurrently or consecutively is symbolic. However, in a case like this where real human being's lives were brutally cut short to devastating effect, each individual victim deserves his own individual justice for Cyrus's brutal crimes. Accordingly, the United States strongly recommends that the defendant receive consecutive sentences for each of his murders and his attempted murder. His victims, Marcus Atkinson, Joseph Hearns, Randy Mitchell, and Ray Jimmerson, Jr., each deserve vindication for the crimes committed against them. They each deserve that symbol, as do their friends, families, and loved ones, even if a symbol is all it is.

## VII. CONCLUSION

For the foregoing reasons and for the evidence submitted and reasons articulated during both guilt and punishment phases of the trial in this matter, the United States respectfully requests that the Court find Offense Level 43, Criminal History Category IV applicable to Cyrus, yielding a Guidelines recommended sentence of life plus consecutive sentences for the four § 924(c) charges. Accordingly, the United States asks that the Court sentence the defendant accordingly:

Count One (narcotics conspiracy): life imprisonment;

Count Two (RICO conspiracy): life imprisonment;

Count Three (VICAR attempted murder of Marcus Atkinson); 10 years imprisonment;

Count Six (VICAR kidnaping of Joseph Hearns): life imprisonment;

Count Nine (witness murder of Ray Jimmerson, Jr.,): life imprisonment;

1     Count Ten (witness retaliation murder of Ray Jimmerson, Jr.,): life imprisonment;

2     Count Eleven (possession with intent to distribute): 5 years imprisonment; and

3     Count Twelve (possession with intent to distribute near playground): 5 years imprisonment,

all the foregoing of which to run concurrently with one another and consecutively with all other counts;

    Count Four (VICAR assault with a dangerous weapon of Marcus Atkinson): 20 years imprisonment, consecutive to all other counts;

    Count Five (VICAR murder of Joseph Hearns): life without the possibility of release, consecutive to all other counts;

    Count Seven (VICAR murder of Randy Mitchell): life without the possibility of release, consecutive to all other counts;

    Count Eight (VICAR murder of Ray Jimmerson, Jr.): life without the possibility of release, consecutive to all other counts;

    Counts Thirteen through Sixteen (weapons counts): life imprisonment, consecutive to all other counts and to each other.

    This to be followed by a total term of supervised release of life, $10,000 in restitution, and $1,600 in special assessments.

DATED: November 15, 2010    Respectfully submitted,

BRIAN J. STRETCH
Acting United States Attorney

        /s
WILLIAM FRENTZEN
ROBERT DAVID REES
Assistant United States Attorneys