1  JAMES S. THOMSON
   Attorney and Counselor at Law
2  California SBN 79658
   819 Delaware Street
3  Berkeley, CA 94710
   (510) 525-9123
4  james@ycbtal.net

5  JOHN T. PHILIPSBORN, ESQ.
   California SBN 83944
6  Law Offices of JOHN T. PHILIPSBORN
   507 Polk Street, Suite 350
7  San Francisco, CA 94102
   (415) 771-3801
8  jphilipsbo@aol.com

9  Attorneys for Defendant DENNIS CYRUS, JR.

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15                                  )   **Case No. CR-05-00324-MMC**
                                    )
16                                  )
   UNITED STATES OF AMERICA,        )
17        Plaintiff,                )   **RESPONSE TO UNITED STATES'**
                                    )   **SENTENCING MEMORANDUM**
18  vs.                             )
                                    )
19                                  )   **Date:  November 19, 2010**
   RAYMON HILL, et al.,             )   **Time: 1:30 PM**
20                                  )
          Defendants.               )   **Dept:  Hon. Maxine M. Chesney**
21                                  )
   _____  )
22

23  **I.      INTRODUCTION.**

24          The United States incorrectly submits that a sentencing departure is warranted based on

25  obstruction of justice, that a downward departure is not warranted based on Mr. Cyrus'

26  demonstrated acceptance of responsibility, and that Mr. Cyrus' Criminal History is IV.  The

27  United States' recommendation that Mr. Cyrus be sentenced to eight consecutive life sentences,

28  three of which are without possibility of release, followed by a consecutive 20 year sentence is

significantly flawed.  The government is wrong to assail the findings and hard work of the U.S. Probation office and the jury that served in this case.  The government's errors stem from its failure to support its arguments with facts from the record or controlling case law, and from its frustration in having failed to win a death sentence in this case.

## II.      OVERVIEW OF SENTENCING GUIDELINES.

The Presentence Report has accurately calculated the advisory Guidelines in this complex case and concluded that the case is Total Offense Level 47, Criminal History Category I, before any mandatory consecutive additions not included in the Guidelines.  Because the Offense Level exceeds Level 43, the advisory Guideline, pursuant to United States Sentencing Guideline (U.S.S.G.) Ch.5, Pt. A, comment. (n. 2), the default level is Total Offense Level 43, Criminal History Category I.   Mr. Cyrus requests that this Court find in accordance with the Presentence Report.

## III.     THE GOVERNMENT HAS WRONGLY CALCULATED ITS SENTENCING GUIDELINE RECOMMENDATION.

The government accuses the probation office of "significantly miscalculat[ing] the guidelines in this case."  United States Sentencing Memorandum (Doc #1650), at 3.  The Presentence Report accurately calculated the complex Guidelines in this case.  The proposed Guideline calculation by the Government violates the rules against double counting.  The government's proposed guideline calculation also includes conduct (attempted murders of Randy Minor and Pedro Raigoza and conspiracy to murder Travis Trammell), which does not meet the test of "relevant conduct" as defined at U.S.S.G. § 1B1.3.

### A.      Minor, Raigoza, and Trammell Incidents Are Not Relevant Conduct.

The government seeks to hold Mr. Cyrus personally responsible, for acts it concedes "he did not personally commit."  Doc. #1650, at 5.  Specifically, the government submits that "the two post-arrest events for which [Mr.] Cyrus is criminally responsible are the attempted murders of Pedro Raigoza and Randy Minor and the conspiracy to murder Travis Trammell."   Neither of these incidents maybe included as relevant conduct for sentencing considerations.

1    It may have been "reasonably foreseeable" to Mr. Cyrus that co-conspirators may have

2  attempted the murder of Randy Minor and Pedro Raigoza. It may have also been reasonably

3  foreseeable to him that others would conspire to murder Travis Trammell.  However, none of

4  that conduct was "jointly undertaken criminal activity," as required by U.S.S.G. 1B1.3.

5    As stated in U.S.S.G. § 1B1.3, comment. (N. 2): "...In the case of jointly undertaken

6  criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct

7  (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal

8  activity; and (ii) reasonably foreseeable in connection with that criminal activity."  Because a

9  count may be worded broadly and include the conduct of many participants over a period of time,

10  the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken

11  criminal activity") is not necessarily the same as the scope of the entire conspiracy.  Hence

12  relevant conduct is not necessarily the same for every participant.  *See also United States v.*

13  *Ortiz*, 362 F.3d 1274, 1277 (9th Cir. 2004) (relevant conduct must be both reasonably

14  foreseeable and jointly undertaken conduct).

15    As the government points out in its Sentencing Memorandum, the attempted murders of

16  Minor and Raigoza and the conspiracy to murder Trammell took place after Mr. Cyrus' arrest.

17  Doc. #1650, at 5.[1]  Those acts may have been reasonably foreseeable to Mr. Cyrus, but they

18  certainly were not "jointly undertaken."  Had there been any evidence that Mr. Cyrus instructed

19  that the acts take place or that he had provided information of some sort to aid the perpetrators,

20  an argument could perhaps be made that the acts were jointly undertaken.  No such evidence

21  exists or was submitted by the government.  At the time of the Trammell conspiracy and the

22  Raigoza and Minor shootings, Mr. Cyrus was in jail and others perpetrated those acts.  The

23

24    [1] The Cyrus Defense has maintained throughout these proceedings that Mr. Cyrus conspiratorial
involvement ended when he was arrested.  *See* Reply to Response to Motion by Dennis Cyrus, Jr for

25  Motion for Bill of Particulars, Doc. # 456; and Trial Motion 21 Motion to Exclude Acts and Substantive
Crime Evidence After Mr. Cyrus's Arrest, Doc. #917.  The Cyrus defense thus never had an opportunity

26  to defend against the government's accusation that Mr. Cyrus was a joint participant in the Trammell
conspiracy and Raigoza and Minor shootings.  Nevertheless, the government has entirely failed to show

27  that the shootings should be considered relevant conduct here by neglecting to show that the shootings
were foreseeable to Mr. Cyrus and that he "jointly" participated in the shootings. U.S.S.G. § 1B1.3.

28

Presence Report correctly excludes those acts in its Guideline calculation.[2]

**B.    The Presentence Report Has Accurately Calculated The Guidelines.**

The government chastises U.S. Probation for finding that "grouping rules can only be applied once, and thus cannot be internally applied within RICO count's guidelines determination." Doc. #1650, at 5. The Government has proposed that the Court calculate its Group 1 (narcotics and murder of Randy Mitchell), Group 3 (attempted murder of Marcus Atkinson), Group 4 (murder of Joseph Hearns), and Group 5 (murder of Ray Jimmerson) and then calculate its Group 2, which uses as its base the exact same calculations embodied in Groups 1, 3, 4, and 5. This is clearly double counting. The Guidelines are constructed to prohibit just such calculations. Here again, U.S. Probation is right and the government is wrong.

The Introductory Commentary to Part D - Multiple Counts, states, in part, "In order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, this Part provides rules for grouping offenses together." Further, "More complex cases involving different types of offenses may require application of one rule to some of the counts and another rule to other counts." U.S.S.G. § 3D1.2, comment. (N. 3) states: "Under subsection (a), counts are to be grouped together when they represent essentially a single injury or are part of a single criminal episode or transaction involving the same victim."

The Presentence Report has applied this concept correctly in its Guideline calculation by grouping all of those counts and Overt Acts that represent substantially the same harm.

---

[2] The government assails the Presentence Report for refusing to include the two post-arrest acts and alleges that U.S. Probation "misunderstands the law" because did not believe there was any evidence Mr. Cyrus knew the acts would occur. Doc. #1650, at 5 n. 2 (citing *United States v. Hoskins*, 282 F.3d 772, 776 (9th Cir. 2002). First, the government ignores the fact that, in order to prove that the Trammell conspiracy and Raigoza and Minor shootings constitute relevant conduct, they must show both foreseeability and "jointly undertaken criminal activity." *See* U.S.S.G. 1B1.3. The government has failed to show that the shootings and conspiracy were jointly undertaken by Mr. Cyrus, and has thus failed to show that the incidents constitute relevant conduct to be considered by this Court when making its sentencing determination. Second, *Hoskins* interpretation of U.S.S.G. § 3B1.3. has been explicitly overruled by the Court of Appeals for the Ninth Circuit in *United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir 2010).

1   Presentence Report ¶¶ 76-77.  The Presentence Report correctly defines four groups.  Group 1 is

2   related to narcotics offenses and the charged murder of Randy Mitchell; Group 2 is related to the

3   murder of Joseph Hearns; Group 3 is related to the murder of Ray Jimmerson; and Group 4 is

4   related to the attempted murder of Marcus Atkinson.  The Presentence Report then applies the

5   Determining the Combined Offense Level rules.[3]  U.S.S.G. § 3D1.4. This calculation results in

6   an Offense Level 49, before the application of the Acceptance of Responsibility reduction

7   (addressed in Defendant's Sentencing Memorandum) and before the adjustment to Level 43, the

8   maximum Guideline level. *See* U.S.S.G. Ch. 5, Pt. A, comment. (n.2).

9
10  **IV.     THE GOVERNMENT HAS WRONGLY CALCULATED MR. CYRUS'
          CRIMINAL HISTORY CATEGORY.**

11          The government refuses to accredit the work of the U.S. Probation Department and,

12  instead, assails its findings in the Presentence Report. *See* Doc #1650, at 14 ("U.S. Probation's

13  position is legally meritless and directly contradicts the facts set forth in its own report.").   The

14  government is mistaken when it accuses U.S. Probation of committing miscalculations in its

15  presentence report.  The government's accusation that the U.S. Probation failed to substantiate its

16  Criminal History findings is unfounded. *See* Doc #1650, at 13.  There is no basis for the

17  government's accusation that U.S. Probation has taken a position "contrary to the Presentence

18  Report itself." *Id.* at 13.

19          The Presentence Report accurately calculated Mr. Cyrus' Criminal History.  For none of

20  his juvenile adjudications did Mr. Cyrus receive a "sentence." For each adjudication there was

21  either no sanction or he was sent to rehabilitation camps that were not secure or locked facilities.

22  Because there was no sentence, these adjudications are simply not counted. Contrary to the

23  Government's assertion, there were no "sentences." Doc. #1650, at 13.

24          The Government also asserts that at the least, Mr. Cyrus was "on probation" at the time of

25  the present offenses. Doc. #1650, at 13.  However, assessing two points for being on probation

26  _____

27          [3] The Presentence Report makes one minor error. Group Four (Level 39) should be ½ unit, rather
    than one unit, as it is between 5 and 8 levels less than the highest Offense Level (Level 45), resulting in a
28  total of 3 ½ levels. The addition of 4 levels to the highest Offense Level is correct, however.

can only be a consequence of a **countable** conviction.  None of Mr Cyrus' juvenile offenses resulted in convictions.  Thus, U.S. Probation's recommendation does not contradict the facts of the presentence report since Mr. Cyrus' juvenile probation violations cannot be used to calculate his Criminal History.

The basis of the government's argument is that Mr. Cyrus' juvenile convictions maybe counted in the criminal history category, even though he was deemed a "ward of the court."  The government argues that *United States v. Sanders*, 41 F.3d 480, 486 (9th Cir. 1994) supports this position.  The government argues that there is no evidence that Mr. Cyrus was ever deemed a ward of the court.  Doc. #1650, at 13-14.

First, the government bears the burden of proving the fact of a prior conviction. *See United States v. Newman*, 912 F.2d 1119, 1122 (9th Cir.1990).  Thus the government must show, beyond a reasonable doubt, that Mr. Cyrus's guilt for the juvenile offenses was adjudicated. *Sanders,* 41 F.3d at 486 ("Absent proof that the California juvenile court found Sanders guilty beyond a reasonable doubt, the adjudication may not be used to increase Sanders' criminal history score.").  The government shirks its duty and claims that the Cyrus defense has failed to prove that Mr. Cyrus was deemed a ward of the court for each juvenile offense.  The government has entirely failed to proffer proof that Mr. Cyrus' guilt for the juvenile convictions was established beyond a reasonable doubt.  The government has thus failed to carry their burden of proving the fact of prior convictions.  Accordingly, this Court should find, in accordance with the Presentence Report, that Mr. Cyrus' Criminal History is I.

## V.   A DOWNWARD SENTENCING DEPARTURE IS JUSTIFIED IN LIGHT OF MR. CYRUS' ACCEPTANCE OF RESPONSIBILITY.

From the inception of this case, the government has insisted on a capital prosecution.[4]  The decision to seek a death sentence, at all costs, has had resounding effects on the proceedings

---

[4] The determination was made by chief officers within the Department of Justice and was based upon political motivations. *See* Eric A Tirschwell and Theodore Hertzberg, *Politics and Prosecution: A Historical Perspective on Shifting Federal Standards for Pursuing the Death Penalty in Non-Death Penalty States*, 12:1 Journal of Constitutional Law 57 (Oct. 2009).

1   in Mr. Cyrus' case.  From the termination of prior United States Attorneys for the Northern

2   District[5] to the assignment of new Assistant United States Attorneys' to the Northern District

3   (including the line prosecutors engaged in this case);[6] from failures to abide with provisions in

4   the United States Attorney's Manual (USAM) when authorizing Mr. Cyrus's case for capital

5   prosecution[7] to failing to abide with provisions in the USAM when electing to usurp state

6   prosecutions;[8] from the government's refusal to disclose material evidence free of redactions; to

7   the government's refusal to review evidence in mitigation prior to capitally authorizing Mr.

8   Cyrus' case.  Had the government not been bent on capitally prosecuting Mr. Cyrus' case, he

9   would not today be facing the possibility of life in prison without the possibility of parole.

10      The government erroneously argues that, "it is abundantly clear that [Mr.] Cyrus has

11  accepted absolutely no responsibility for his actions." Doc #1650, at 11.  In the government's

12  view, the only way that Mr. Cyrus could have accepted responsibility would have been for him to

13  have plead open "to any or all of his counts of convictions to the Court without any agreement by

14  the prosecution," *Id., and accept the punishment of death*.   The government ignores Mr. Cyrus'

15  constitutional rights to a fair trial and proof of his guilt beyond a reasonable doubt.

16      The government also ignores Mr. Cyrus' repeated attempts to accept responsibility and

17  plead guilty to the crimes alleged.  Instead, the government hides behind the argument that it is

18

19      [5] In July 2002, Kevin Ryan was appointed as the United States Attorney for the Northern District
20  of California.  In February 2005, the Attorney General of the United States, John Ashcroft, resigned and
    was replaced by Alberto Gonzales.  On November 1, 2006, the notice of intent to seek the death penalty
21  was filed in this case.  (Doc #266).  In February 2007, Mr. Ryan left office.  He was replaced by interim
    United States Attorney Scott Schools.  Mr. Schools was appointed on February 16, 2007. *See* Motion for
22  New Trial Based on Fifth, Sixth, and Eighth Amendment Violations , Doc. #1581 (citing U.S. Dept. of
    Justice, An Investigation Into the Removal of Nine U.S. Attorneys in 2006, 325 (2008)).
23

24      [6] On December 11, 2006, attorney William Frentzen was added to this case.  Criminal Docket for
    Case #: 3:05-cr-00324-MMC (All Defendants).

25
        [7] *See* Motion for New Trial Based on Fifth, Sixth, and Eighth Amendment Violations , Doc.
26  #1581, at 19-21 (citing violations of USAM § 9-10.010, § 9-10.020,  § 9-10.030,  § 9-10.040, § 9-10.050,
    § 9-10.060, § 9-10.070, and 9-10.080).

27
        [8] *See* Motion for New Trial Based on Fifth, Sixth, and Eighth Amendment Violations , Doc.
28  #1581, at 5-18 (citing violations of USAM §§ 9-27.230(A)(1-8); § 9-27.240; and § 9-27.260).

1   "irrelevant and improper for the defendant to refer to or submit failed plea negotiations between

2   the parties...." Doc. #1650, at 10.   Despite case law to the contrary, the government believes that

3   settlement negotiations "do not arguably relate to any of section 3553(a)'s factors nor any of the

4   reasons set forth in the Guidelines related to acceptance of responsibility." *Id.*   The government

5   threatens that if this Court considers "the reasonableness of the parties' negotiating positions

6   leading up to and into trial" it will "commit a potential Rule 11 violation." *Id.*

7         Contrary to the government's assertions, the "circumstances of [Mr. Cyrus'] plea offer[s]

8   in this case are [] mitigating." Doc #1650, at 11.  The government concedes that Mr. Cyrus

9   offered to plead guilty to a life sentence in exchange for the government's "agree[ment] not to

10  seek a death sentence." *Id.*  The government attempts to diminish the significance of Mr. Cyrus'

11  offer to plead to life in prison by arguing that it was not "sincere" and was made after Mr. Cyrus

12  "finally realized the gravity of the situation and the evidence against him." *Id.*  In truth, however,

13  the government forced Mr. Cyrus into going to trial by: 1) refusing to entertain settlement

14  negotiations; 2) refusing to accept his settlement offers; 3)  agreeing to settlements with his co-

15  defendants; and 4) refusing to disclose material evidence until just prior to the start of the trial.

16        First, the parties' attempts to negotiate a settlement are a relevant sentencing

17  consideration both under the sentencing guidelines and controlling case law.  *See* U.S.S.G. §

18  3E1.1, cmt. n.3 ("entry of a guilty plea prior to trial...constitutes 'significant evidence' of

19  contrition."); and *United States v Cantrell*, 433 F.3d 1269, 1285 (9th Cir. 2006) ("[e]ven without

20  the 'significant evidence' of a guilty plea, a defendant who chooses to go to trial may still exhibit

21  sufficient contrition to merit an adjustment under § 3E1.1.").  Indeed, it is telling that the

22  government's Sentencing Memorandum is devoid of any reference to *Cantrell*, and the other

23  cases cited by Mr. Cyrus in support of his Sentencing Memorandum.  This is because there is no

24  basis in the law for the government's position that discussion of settlement negotiations is

25  irrelevant to sentencing proceedings and violates Rule 11.[9]  The government has failed to

26  _____

27        [9] The government's point in citing Federal Rule of Criminal Procedure (FRCP) Rule 11 is
    unclear.  The Rule does not explicitly forbid this Court from considering settlement negotiations during
28  sentencing proceedings, but instead indicates that "the admissibility or inadmissibility of a plea, a plea

1    carefully read the sentencing guidelines and established law, which clearly holds that "[p]leading

2    guilty in advance of trial and truthfully disclosing the details of all relevant conduct usually will

3    constitute substantial evidence that a defendant has accepted responsibility. *See* U.S.S.G. §

4    3E1.1, cmt. (n.3)." *U.S. v. Deppe*, 509 F.3d 54, 61 (1st Cir. 2007).

5    　　　Second, a defendant's efforts to prove acceptance of responsibility through settlement

6    negotiations is not defeated by that defendant's failure to "plead open in court."   In making the

7    contrary argument, the government entirely fails to account for the fact that such a plea would

8    have come "without any agreement from the government," and would have exposed Mr. Cyrus to

9    the ultimate punishment - execution by lethal injection.   Thus, what prevented Mr. Cyrus from

10   entering an open plea, was not his lack of responsibility, but rather, the very real prospect of

11   death and the government's insistence on a penalty phase.[10]   Likewise, since the government

12   refused to seek a sentence other than death, Counsel could not truly entertain the notion of

13   entering an open plea for Mr. Cyrus with the knowledge that doing so could likely lead to his

14   execution.  This decision is supported by the AMERICAN BAR ASSOCIATION's Guidelines for the

15   Appointment and Performance of Defense Counsel in Death Penalty Cases, which indicates that

16   _____

17   discussion, and any related statement is governed by Federal Rule of Evidence (FRE) 410." Federal
     Rules of Criminal Procedure, Rule 11(f). FRE Rule 410 only forbids introduction of evidence regarding

18   pleas when it is introduced *against the defendant*.  Thus here, where Mr. Cyrus has proffered the
     negotiation evidence, it is manifestly admissible under FRCP Rule 11 and FRE Rule 410.  It is unclear

19   how the government reasons that this Court can commit a Rule 11 violation by considering evidence of
     plea that was never entered into by the parties due to the government's refusal to entertain settlement

20   negotiations.

21   　　　[10] Had Mr. Cyrus proffered such a plea, he would have significantly handicapped his chances of

22   receiving a favorable sentence, by discarding an opportunity to present exculpatory evidence regarding
     his intoxication, mental health, or intent during the crimes alleged and by testing the strength of the

23   government's case.   Similarly, such a plea would have also cost Mr. Cyrus the critical opportunity of
     formulating a rational and coherent theory for his defense, that could be used between the guilt and

24   penalty phases. Indeed, AMERICAN BAR ASSOCIATION's Guidelines for the Appointment and
     Performance of Defense Counsel in Death Penalty Cases, recommends that "Counsel should seek a

25   theory that will be effective in connection with both guilt and penalty, and should seek to minimize any
     inconsistencies," and accordingly recognizes that "well before trial, counsel must formulate an integrated

26   defense theory that will be reinforced by its presentation at both the guilt and mitigation stages.  Counsel
     should then advance that theory during all phases of the trial, including jury selection, witness

27   preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." Guide

28   10.10.1; commentary.

"If no written guarantee can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights." Guideline 10.9.2; commentary.

Third, the government refused to enter into negotiations at all with Mr Cyrus. This was despite the fact that prior to trial Mr. Cyrus repeatedly offered to plead to terms that would have surpassed his life expectancy,[11] and also offered to plead guilty to the crimes alleged in exchange for life in prison. Moreover, the government refused to grant Mr. Cyrus any involvement in negotiations with his co-defendants and ultimately reached settlement agreements with each co-defendant. In entering into these agreements, which were all reached below guideline terms and came nearly a year before the start of Mr. Cyrus' trial,[12] the government cleared the way for a capital prosecution free of obstacles presented by the co-defendant's potential trials. The government also revealed, by refusing to negotiate with Mr. Cyrus while freely negotiating with his co-defendants, including capitally eligible co-defendants, their intent to capitally prosecute Mr. Cyrus, *alone,* at all costs.

Fourth, had the government timely provided usable discovery, including exculpatory evidence regarding Mr. Cyrus' intent and state of intoxication, the Cyrus defense would not have been forced into the position of making negotiations during the trial.[13] Indeed, it was not until

---

[11] Each of these terms would have surpassed Mr. Cyrus' life expectancy. Nationally, for an African- American male born in 1984, the average life expectancy is sixty-six (66) years. National Center For Health Statistics: *Vital Statistics of the United States*, 1984, Vol. II, Sec. 6, Life Tables. DHHS Pub. No. (PHS) 87-1104. Public Health Service, Washington. U.S. Government Printing Office, 1987. Mr. Cyrus was born on June 11, 1984 and, accordingly, in 2007 Mr. Cyrus' could have expected to live for another forty-three (43) years. Thus, his expected life span was five and thirteen (13) years shorter than the settlement terms proposed in the plea agreements proffered by the Cyrus defense.

[12] On January 29, 2008 the government entered into a plea agreement with Mister Meiuller, Lester Hogan, and Aquil Peterson for 84 months, 144 months, and 264 months respectively. Doc. #789, #791, and #793. On February 4, 2008, the government entered into a plea agreement with Steve Wilson for 132 months. Doc. #802. Finally, on February 6, 2008, the government entered into a plea agreement with Raymon Hill, who the government has described as the lynchpin of the gang, for 168 months. Doc. #813.

[13] *See* RT 3430-39; and Memorandum in Support of Motion to Dismiss Superceding Indictment, or in the Alternative, Bar Use of the Death Penalty, or for Lesser remedies for Brady Violations and For

---

January 13, 2009, during jury selection and one month before the start of the trial, that the government provided discovery free of redactions.  Had the government disclosed material evidence and witness names earlier, the Cyrus defense could have more competently judged the case against Mr. Cyrus and would have accordingly adjusted its settlement offers.[14]  However, all the evidence indicates that even if the Cyrus defense had presented such an offer prior to trial the government would have steadfastly refused to negotiate.

Fifth, the government blames Mr. Cyrus for proceeding to trial despite the fact that the government refused negotiating for a sentence less than death.  The government chastises Mr. Cyrus for "vigorously cross-examin[ing] nearly every witness." Doc. #1650, at 11.  The government mistakenly argues that Mr. Cyrus "ask[ed] for a finding of not guilty on all counts during closing statements." *Id.*

The government is wrong to blame Mr. Cyrus for exercising his constitutional rights to remain silent, cross-examine witnesses, invoke compulsory process, receive a fair trial, and be proven guilty, beyond a reasonably doubt, as determined by an impartial jury.  This is especially true in light of the fact that the government forced Mr. Cyrus to go to trial and forced him into submitting an intoxication defense.[15]  Mr. Cyrus should not be penalized for having to *defend his life* against the government's insistence on the death penalty.

Moreover, the government is wrong in arguing that counsel for Mr. Cyrus did not concede Mr. Cyrus' guilt during arguments and thereby demonstrate his client's acceptance of

---

Untimely Disclosures, Doc. # 1195.

[14] Had the government been required to provide discovery as it has in *United States v. Cerna*, 3:08-cr-00730, Doc #2467, then the Cyrus defense would have more quickly responded with a life settlement offer.

[15] The government characterizes Mr. Cyrus' guilt phase intoxication defense as "false." *See* Doc. #1650, at 14.  First, the defense was not "false" since there exists substantial evidence of Mr. Cyrus' intoxication at the times of the crimes alleged. *See* Memorandum and Summary of Evidence of Drug and Alcohol Usage In Support of Requested Instruction, Doc. #1356.  To the extent that the intoxication defense was ineffective, it was the government that forced Mr. Cyrus into submitting an ineffective defense by failing to timely disclose unredacted discovery and by insisting on a capital trial.

1  responsibility.  Indeed, the first words from counsel's mouth during opening statements in the

2  guilt phase were:

> For the most part, given what you've heard from the government, I can tell you our
> approach is more on what it is rather than who it is. I'm going to go through some of
> the counts individually, but you're going to see that we are not going to dispute in
> certain particulars the identification of Dennis Cyrus by persons who have known
> him for some period of time. Okay?

6  RT 2966.

7      Counsel went on, in closing arguments, to argue that "intoxication doesn't necessarily

8  mean that a person is not guilty of a crime."  RT 9721.  Counsel also argued that, "[i]t's not as

9  though we were disputing the strength of the evidence that links us to certain killings. Okay?"

10  RT 9582.  Thus, while Mr. Cyrus put the government's case to its burden of proof, he did so in

11  order to save his life, with an eye on the penalty phase, and while demonstrating his acceptance

12  of responsibility for the crimes alleged.

13      Finally, the government goes through the factors under U.S.S.G. § 3E1.1 not established

14  or submitted by the Cyrus defense and argues that Mr. Cyrus has not demonstrated acceptance of

15  responsibility. *See* Doc. #1650, at 11-12.  The government argues that Mr. Cyrus has never

16  truthfully admitted to his conduct and chastises him for not waiving his rights under the Fifth

17  Amendment and testifying at trial or speaking with U.S. Probation.  Doc #1650, at 11.  The

18  government argues that Mr. Cyrus did not withdraw from the alleged criminal conduct because

19  he left California and wrote rap lyrics about the crimes alleged.  *Id.*  The government believes that

20  Mr. Cyrus has exhibited no "post-offense rehabilitative efforts" and argues, with no factual

21  support, that "his interactions with psychologists have not been to seek treatment but have been

22  to fight his crimes." *Id.* at 12.

23      First, in order for Mr. Cyrus to earn a reduction for acceptance of responsibility, it is not

24  required that he prove every factor listed in U.S.S.G. 3E1.1.  Second, the factors alleged by the

25  government were never submitted by Mr. Cyrus as demonstrative of his acceptance of

26  responsibility.   Third, Mr. Cyrus offered to truthfully admit to this conduct when he offered, on

27  three separate occasions, to plead guilty to the crimes alleged.  Likewise, counsel for Mr. Cyrus

28  did concede his guilt at trial and this Court should not penalize Mr. Cyrus for the exercise of his

1   constitutional rights, in testing the government's case against him, in a case where he was forced

2   *to fight for his life*.  Fourth, Mr. Cyrus has withdrawn from criminal enterprises while in jail as

3   demonstrated by his flawless institutional record.  Moreover, following the crimes, Mr. Cyrus did

4   not immediately flee, but instead, turned to his family who directed him to go to Atlanta and stay

5   with his uncle Otis Harris.  Fifth, Mr. Cyrus' institutional record demonstrates that he has

6   exhibited "post-offense rehabilitative efforts."  Moreover, it is incredulous for the government to

7   comment on Mr. Cyrus' psychological treatment, with no evidence as to the substance or context

8   of his discussions with his doctors.

9       Mr. Cyrus has demonstrated an acceptance of responsibility for his crimes during pretrial

10   negotiations, during trial proceedings, and in his post-conviction rehabilitative efforts.  The

11   government's arguments to the contrary run against clearly established law, U.S. Probation's

12   recommendations, and the facts of this case.

13
14   **VI.   THE GOVERNMENT HAS FAILED TO ESTABLISH A BASIS FOR AN
       UPWARD DEPARTURE AND, ALTERNATIVELY, UPWARD AND
       DOWNWARD DEPARTURES ARE WARRANTED.**

15
16       **A.   There Is No Basis for a Finding of Obstruction of Justice In this Case.**

17       The Cyrus defense cannot deny that two of Mr. Cyrus's convictions, based on the murder

18   of Mr. Jimmerson, inherently contain obstruction of justice elements.  However, beyond these

19   charges, no other facts from the record support a sentencing departure for obstruction of justice.

20   Indeed, U.S. Probation recognized as much when they rejected, in the presentence report, the

21   government's request to make such a finding.  Mr. Cyrus is already set to be punished for the

22   murder of Mr. Jimmerson, to the tune of life in prison, and any additional enhancements in his

23   sentence, for the same offense, are not warranted.

24       The government believes that an upward departure is justified because Delwan Blazer

25   testified that Mr. Cyrus "asked him to lie about his knowledge of the Randy Mitchell murder

26   while both were in custody." Doc. #1650, at 4.  Delwan Blazer's testimony is incredible and

27   should not be given any credence here.  Mr. Blazer approached Mr. Frentzen in an effort to be

28   released from prison.  Mr. Blazer's testimony is riddled with factual inconsistencies.   It is a

1   stretch to believe Mr. Blazer when he states the Mr. Cyrus tried to get him to testify falsely and

2   there is no evidence corroborating Mr. Blazer's testimony.  Moreover, the Cyrus defense had no

3   ability to investigate or refute Mr. Blazer's allegations, prior to his testimony, due to the

4   government's refusal to submit material evidence in a timely and unredacted fashion prior to

5   trial.

6        The government also erroneously alleges that an obstruction of justice departure is also

7   warranted because Mr. Cyrus, "ensured that the murder weapon, a Desert Eagle, was disposed

8   of by witness Genece Hopkins after receiving it from Patrick Koller, who got it from

9   Cyrus with instructions to get rid of it." Doc. #1650, at 8.  This allegation is unsubstantiated and

10  based upon hearsay.  The government had the opportunity to call Mr.  Koller at trial and confirm

11  these allegations.  The government chose not to do so, presumably, because Mr. Koller's

12  testimony would not substantiate the government's theory regarding the disposal of the Desert

13  Eagle.  In the absence of more substantiated evidence, this Court should not make a finding of

14  obstruction of justice based on the government's failure to locate the Desert Eagle.

**B.    Alternatively, Adjustments For Obstruction of Justice and Acceptance of
        Responsibility Are Warranted.**

The government does not believe that in this case adjustments for acceptance of

responsibility and obstruction of justice can both apply. Doc #16450, at 12.  The government,

however, admits that under the sentencing guidelines both adjustments can apply under U.S.S.G.

§§ 3C1.1 and 3E1.1.   The government wrongly concludes that this is not "one of the

extraordinary situations where obstruction and contrition occur simultaneously." Doc. #1650, at

12.

This is one of the "extraordinary cases" where obstruction of justice and acceptance of

responsibility adjustments can both apply.   Mr. Cyrus was barely eighteen (18) years of age

when he committed the crimes and the obstruction of justice incidents alleged by the

government.  Since that time he has demonstrated post-conviction rehabilitative efforts.   He has

also accepted responsibility for his actions by offering to plead guilty to the crimes alleged, to

terms that would extend well past his life expectancy.  As such, he has satisfied the test,

described by the Ninth Circuit, for application of both adjustments:

> the relevant inquiry for determining if a case is an extraordinary case within the meaning of Application Note 4 is whether the defendant's obstructive conduct is not inconsistent with the defendant's acceptance of responsibility. Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice. In other words, as long as the defendant's acceptance of responsibility is not contradicted by an ongoing attempt to obstruct justice, the case is an extraordinary case within the meaning of Application Note 4 and simultaneous adjustments under §§ 3C1.1 and 3E1.1 are permissible.

*United States. v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) (citations ommitted).

Here, the incidents alleged by the government as obstruction of justice occurred prior to Mr. Cyrus' offers to plead guilty, accept responsibility for the crimes alleged, and serve the rest of his life in prison. In this regard the facts of his case resemble the facts in *Hopper* where the Ninth Circuit found that both adjustments could and should apply.[16]  *See Hopper*, 27 F.3d at 383; *see also United States v. Booth*, 996 F.2d 1395, 1396-97 (2d Cir.1993) (defendant told victim not to cooperate with FBI and later confessed); *United States v. Lallemand*, 989 F.2d 936, 937-38 (7th Cir.1993) (defendant initially counseled accomplice to destroy evidence and then later confessed and told accomplice not to destroy evidence). Thus, even if this Court finds that Mr. Cyrus attempted to hide the Desert Eagle and sway Mr. Blazer's testimony, these incidents occurred well before his offers to plead guilty and this Court should award him a three point downward departure, for acceptance of responsibility, and a two point upward departure, for obstruction of justice.[17]

---

[16] *See Hopper*, 27 F.3d at 383 ("Hopper's obstructive conduct of burning evidence and attempting to procure false alibis is not inconsistent with his subsequent confession of guilt and disclosure of information relating to the crime. Hopper's obstructive conduct occurred soon after he discovered his father had been arrested, and although the conduct persisted for a few days, it was not a methodical, continued effort to obstruct justice. Further, Hopper did not feign acceptance of responsibility while continuing obstructive conduct in an attempt to hinder the Government's investigation.").

[17] Additionally, these incidents should not be considered since they were spur of the moment. The Ninth Circuit has previously rejected consideration of spur of the moment actions prior to arrest as relevant in determining whether an adjustment under § 3E1.1 would be incompatible with an adjustment under § 3C1.1. *See United States v. Lato*, 934 F.2d 1080, 1083 n. 2 (9th Cir.), *cert. denied*, 502 U.S. 897 (1991). "Such actions do not demonstrate a concerted, continued effort to obstruct justice which is inconsistent with acceptance of responsibility." *United States v. Hopper*, 27 F.3d 378, 384 n. 4 (9th Cir.

---

1          **C.     No Other § 3553(a) Factors Apply.**

2          The government believes that § 3553(a) factors "speak for themselves."  The government

3    says that the circumstances of the crime "will not be repeated in detail here" since they  "were

4    essentially articulated during the government's closing and rebuttal arguments in the penalty

5    phase of the trial."  Doc #1650, at 14.  Nevertheless, the government goes on, in detail, to recall

6    some of the more lurid circumstances of the crime.  Like in their opening statement at trial, the

7    government believes that appeals to passion, specifically calling Mr. Cyrus a "serial killer" and

8    characterizing the circumstances of the crimes as "especially heinous, involving torture,

9    kidnaping, humiliation, execution," will result in increases to Mr. Cyrus' sentence.  Doc #1650,

10   at 14.  It is unfortunate that the government believes that this tasteless tact will result in increases

11   to Mr. Cyrus' sentence.  The government is also wrong to prejudge the temperament of this

12   Court.  Here the rule of law, evidence supporting a finding of acceptance of responsibility, and

13   the *correct* sentencing guideline calculations, as deduced by the U.S. Probation Department, will

14   decide Mr. Cyrus' sentence.

15         There is no basis in the sentencing guidelines or the facts of this case for the

16   government's sentencing recommendation.  Indeed, the government understands that asking for

17   "eight consecutive life sentences, three of which are without possibility of release, followed by a

18   consecutive 20 year sentence" is "symbolic." Doc. #1650, at 15.  Though its recommendation is

19   entirely based in "symbolism," the government nevertheless assails U.S. Probation's guideline

20   recommendations, finding that Mr. Cyrus has no previous criminal history, rejection of the

21   obstruction of justice adjustment, and finding that Mr. Cyrus has accepted responsibility.  The

22   government lacks case law and facts in support of its argument, so instead it conclusorily argues

23   that the Presentence Report is "legally meritless," "contradict[ory]" "significantly miscalculated,"

24   "badly miscalculated," and "confused." *Id.* at 3, 4, 5, 10, 11, and 13.[18]   In its place, the

25

26   1994).

27         [18] The government's denigration of U.S. Probation cross the line of professionalism.  The
28   government succumbs to attacks in belief that their experience as attorneys supersedes U.S. Probation's
     expertise in sentencing.  It is, however, the government who has incorrectly calculated the sentencing

1   government would substitute a new sentencing factor, whether each victim "deserve[s] [a]

2   symbol as do their friends, families, and loved ones, even if a symbol is all it is" *Id.* at 15.  In this

3   sentencing determination, appeals to passion should not stand in place of established facts, U.S.

4   Probation's expertise, and the guideline recommendations.

5        Most incredulously, the government labors to subvert the jury's penalty phase verdict.[19]

6   The government either doesn't understand or refuses to accept the fact that the jury unanimously

7   *rejected* the punishment of death.  The government cajoles themselves for the fact that "the jury

8   found every single statutory aggravating factor and all but one non-statutory aggravating factor

9   unanimously." Doc #1650, at 14.[20]  The government laments the fact that "the jury unanimously

10  found only a single factor weighing against the death penalty, at the much lower evidentiary

11  standard of more likely than not."[21]  In the government's view, "whatever mitigation there may

12  be in [Mr.] Cyrus' favor, it is overwhelmingly outweighed by the multitude and magnitude of the

13  serious aggravating factors...." Doc. #1650, at 15.

14       This argument borders on the unbelievable.  Moreover, it runs directly contrary to the

15  jury's special verdict which rejected a finding that "the aggravating factor or factors found to

16  _____

17  guidelines, Mr. Cyrus' Criminal History, and failed to support its requests for departure with facts from
    the record.  Moreover, U.S. Probation, as a disinterested party in this litigation, has no reason to submit

18  false recommendations, unlike the government, who are still seething from losing the penalty phase.

19       [19]  The government chastises Mr. Cyrus for seeking a sentence of life in prison based on
    sentencing departures "after representing to the court and the jury that the only possible sentences for his

20  murders were death and life without the possibility of release." Doc #1650, at 14.  This argument errors
    by alleging that defense counsel has made misrepresentations to this Court and by failing to understand

21  pertinent law.  Counsel never made misrepresentations to this Court.  It was known all along that if the
    jury rejected the penalty of death, and unanimously agreed to life in prison without the possibility of

22  parole, this determination would be subject to this Court's review at sentencing and, any applicable
    sentencing departures justified by law and fact, could alter the ultimate sentence given to Mr. Cyrus.

23

24       [20] The government ignores the fact that the Cyrus defense conceded that many of the aggravating
    factors could be found, but that the finding of factors was not as important as determining whether "every

25  one of the aggravating factors have been proven beyond a reasonable doubt but that their weight is not of
    much moment because of other factors in the case." RT 13903.  As to that determination, the jury clearly

26  rejected the "multitude and magnitude" of the factors in aggravation in rejecting the sentence of death.

27       [21] The lower evidentiary standard has no bearing on the jury's determination here.  Indeed, the
    jury could have determined that, *beyond all doubt*, the "multitude and magnitude" of the factors in

28  mitigation supported a sentence of life in prison over the death penalty.

1   exist sufficiently outweigh[ed] any mitigating factor or factors...." Doc. #1529, at 18. Far from

2   establishing the "multitude and magnitude" of the aggravation evidence, the jury's verdict

3   indicates that the government's penalty phase case was *far* weaker than it believes and *far*

4   weaker than Mr. Cyrus' case in mitigation. Indeed, in the jury's unanimous rejection of the

5   *weight* of the aggravating factors, is proof that this case should never have been capitally

6   authorized, should never have been capitally prosecuted, should never have gone to trial, should

7   never have proceeded to a penalty phase, and should never have been charged in federal court.

8

## VII.   CONCLUSION.

9

      From the start of this case, the government has setup a false dichotomy, between life and

10  death, without support from the USAM, evidence in aggravation, and without consideration of

11  the wealth of evidence in mitigation. The government's determination to earn a sentence of

12  death, at all costs, has unnecessarily led to a capital trial, penalty phase, and now these sentencing

13  proceedings. Mr. Cyrus' case should never have been capitally prosecuted and, instead, should

14  have been treated like the cases of other similarly situated individuals in San Francisco and the

15  Northern District.[22] Had the government correctly charged and prosecuted this case, Mr. Cyrus

16

17        [22] *See* Motion for New Trial Based on Fifth, Eighth and Fourteenth Amendment Violations, Doc

18  # 1581, at 25-27:

        **A.    Nuestra Familia Gang.**

19        In an Indictment filed in the Northern District of California in 2000, members of the "Nuestra Familia" gang were charged in a RICO Indictment with drug distribution, robbery, murder and other

20  violent crimes. 3:00-cr-00654-CRB; (Doc #1). In total, five murders were charged and many other murders were attributed to the gang. The two "shot callers," Tex Hernandez and Gerald Rubalcaba,

21  were sentenced to life imprisonment.

        **B.    Down Below Gang.**

22        In an Indictment filed in the Northern District of California in 2005, 12 members of the notorious "Down Below," or "Sunnydale," a gang located in one of San Francisco's most violent neighborhoods,

23  were indicted for drug distribution, murder, robbery, witness intimidation, and numerous firearm offenses. 3:05-cr-00167-WHA; (Doc #1). The Indictment chronicled seven murders and a number of

24  attempted murders. Edgar Diaz was charged in the Indictment with the murders of Beverly Robinson, Kenya Taylor, and Antoine Morgan, and the attempted murders of Marvin Evans, Monique Jones,

25  Gowan McLin, and Avery Clark. Emile Fort was charged in the indictment with various acts of violence including the murders of Glenn Maurice Molex, Jr., Jovanie Banks, and Michael Hill. Edgar Diaz was

26  sentenced to 480 months. Emile Fort was sentenced to 496 months.

        **C.    West Mob Gang.**

27        In two Indictments filed in 2001 and 2004 in the Northern District of California, members of the

28  so-called "West Mob" gang were indicted for offenses, including drive-by shootings, murder in the

would not be facing the punishment of life in prison without the possibility of parole that he faces today.

Instead, of sentencing Mr. Cyrus to life without the possibility of parole, this Court should sentence him to eight terms of life in prison with the possibility of parole and one term of twenty (20) years, to run concurrently.  In so doing, this Court can recognize Mr. Cyrus' efforts to accept responsibility and save everyone, including the victim's families, from the harrows of enduring a six-month trial.  Moreover, this Court can grant him the opportunity to hope and a reason to continue rehabilitating.

Dated: November 17, 2010                                    Respectfully Submitted,

                                                            JAMES S. THOMSON
                                                            JOHN T. PHILIPSBORN

                                                            /s/ James Thomson
                                                            _____
                                                            JAMES S. THOMSON
                                                            Attorney for Dennis Cyrus Jr.

---

course of committing a weapon offense, maiming and assaulting in aid of racketeering, and murder in aid of racketeering. 3:04-cr-00083-VRW; (Doc #1).  Three defendants were originally charged with capital offenses, James Hill, David George, and Trearl Malone.  Hill was eventually sentenced to 78 months for a drive-by shooting; George was sentenced to 78 months for a drive-by shooting; and Malone was sentenced to 14 months for a weapon offense in connection with drug trafficking crime.

Response to United States' Sentencing Memorandum                                      19